Gottus *v.* Allegheny County Redevelopment
Authority, Appellant.

Argued January 9, 1967. Before BELL, C. J., MUS-
MANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS,
JJ.

reargument re-
fused June 22, 1967.

*Alan L. Ackerman,* with him *Sylvan Lisbon,* for ap-
pellant.

*William Claney Smith,* for appellees.

OPINION BY MR. JUSTICE EAGEN, May 24, 1967:

On June 27, 1963,[1] the Redevelopment Authority of Allegheny County (Authority) by virtue of its power of eminent domain, through proper resolution, condemned and appropriated certain lands, including improvements and fixtures thereon, of August and Theresa Gottus for the purpose of redevelopment. The Board of View of Allegheny County awarded the owners damages in the amount of $65,000. Both sides appealed to the Court of Common Pleas of Allegheny County, and a jury trial resulted in a verdict in favor of the owners in the amount of $87,125 (including detention damages). The Authority appeals from the judgment entered on the verdict.

The appellant contends that prejudicial trial errors require a new trial. The assignments of error will be discussed ad seriatim.

The land condemned consisted of a double lot, forty feet by one hundred and twenty feet, in the central business district of McKees Rocks. The improvements consisted of three buildings. The owners conducted a retail cleaning business on the premises which included a retail front for the collection and distribution of clothes, clothes racks, pressing equipment and machinery for the washing and cleaning of clothes. The last mentioned equipment was housed in a building specially constructed for this purpose.

After the taking was effected the Gottuses established the business at a new location. They removed, from the condemned premises to the new business address, all of the clothes racks and pressing equipment, but left behind the cleaning and washing machinery

---

[1] Prior to the effective date of the new Eminent Domain Code of June 22, 1964, P. L. 84, §101, 26 P.S. §1-101 et seq. (Supp. 1966).

which was eventually sold by the Authority at public sale.

The washing and cleaning machinery was described as a Stoddard Solvent System. It was not unique and merely bolted to the floor. However, through the installation of piping and special electrical wiring, the premises were adapted to the use of this equipment. In the cleaning process a petroleum base solvent circulated through the washers, was recovered from the washers, dryers and extractor, then purified by a filter and still and deposited in an underground tank for further use. Specifically, this machinery included as an integral part of the operation two washers, three dryers, a filter, an extractor, two reserve tanks, a water repellant machine and three pumps.

At trial the condemnees took the position that the cleaning machinery was a compensable part of the realty by application of the Assembled Industrial Plant Doctrine, and introduced expert opinion testimony as to the value of the realty as an assembled operating cleaning plant. These witnesses first fixed the fair market value of the realty as a cleaning plant in operation, without consideration for good will, and deducted from that sum the value of the equipment removed and taken to the new business location. The condemnor, on the other hand, maintained that the machinery involved could have been removed without damage to the realty, was personal property and should not be considered in fixing the realty value. The trial court charged the jury that in determining the value of the property condemned, the land, buildings *and* machinery were to be taken into consideration, the Assembled Industrial Plant Doctrine applied; and thereunder machinery and equipment which were necessary to the operation of the plant and placed therein for permanent use became fixtures, irrespective of whether they were physically attached to the realty.

This is assigned as error. Hence, the prime question presented by this appeal is whether or not the Assembled Industrial Plant Doctrine applies in eminent domain. It is a question of first impression in Pennsylvania.

The doctrine stems from *Voorhis v. Freeman*, 2 W. & S. 116 (Pa. 1841).[2] The contest therein was between a purchaser at a mortgage foreclosure sale and a creditor of the mortgagor who levied upon certain machinery in an iron rolling mill, and concerned priority rights in the machinery. In holding in favor of the purchaser of the realty, Mr. Chief Justice GIBSON speaking for the Court at 119, fashioned what was to become the Assembled Industrial Plant Doctrine, when he said: "Whether fast or loose, therefore, all the machinery which is necessary to constitute it, and without which it would not be a manufactory at all, must pass for a part of the freehold."

The doctrine has often been applied by the courts in at least two variations of the original industrial mortgage situation. See, e.g., *Central Lith. Co. v. Eatmor Chocolate Co.*, 316 Pa. 300, 175 A. 697 (1934) (subsequent sheriff sale purchaser and unpaid chattel vendor), and *In re Taylor and Dean Mfg. Co.*, 136 F. 2d 370 (3d Cir. 1943) (trustee in bankruptcy and the holder of the real property interest).

The doctrine has also been applied in the separate area of local real estate taxation in order to bring plant machinery within the assessment base. See, *United Laundries v. Board of Property Assessment*, 359 Pa. 195, 58 A. 2d 833 (1948).

In *United Laundries v. Board of Property Assessment,* supra, it was specifically held that a commercial

[2] See generally, Leary, Financing New Machinery for Mortgaged Pennsylvania Industrial Plants, 4 Vill. L. Rev. 498 (1959), for a history of the doctrine. See, also, *In re Ginsburg*, 255 F. 2d 358 (3d Cir. 1958).

laundry is an "industry" within the meaning of the Assembled Industrial Plant Doctrine for the purpose of real estate taxation. While the question therein involved the construction of the Act of May 22, 1933, P. L. 853, §201, as amended by the Act of July 2, 1941, P. L. 219, §1, 72 P.S. §5020-201, the court based its conclusion that the machinery (although not attached to the realty) was subject to assessment and taxation on the premise that it came within the specific provision of the statute covering "all other real estate."

We recognize that the underpinnings of the doctrine in its various applications stem from different policy considerations. In the mortgage cases we have one consideration;[3] in the taxation case (*United Laundries*) supra, there is the statutory language; and, in eminent domain cases there are still other underlying considerations, mainly economic. Regardless, it appears anomalous to us to hold that the machinery of a commercial laundry is realty for tax assessment purposes and not such for eminent domain.

Some measure of the notions involved in applying the doctrine to a taking by eminent domain may be garnered from the language of Judge CARDOZO in *Jackson v. State of New York*, 213 N.Y. 34, 35-6, 106 N.E. 758 (1914): "Condemnation is an enforced sale, and the State stands toward the owner as buyer toward seller. On that basis the rights and duties of each must be determined. It is intolerable that the State, after condemning a factory or warehouse, should surrender to the owner a stock of second-hand machinery and in so doing discharge the full measure of its duty.

---

[3] See *Commonwealth v. Haveg Industries*, 411 Pa. 515, 519, 192 A. 2d 376, 378 (1963): "This doctrine is based, first and foremost, upon the intention of the parties that the lien of a mortgage on an industrial plant should extend to the machinery and equipment therein and, second, on consideration of a public policy to encourage financing of industrial plants [citing case]."

Severed from the building, such machinery commands only the prices of second-hand articles; attached to a going plant, it may produce an enhancement of value as great as it did when new. The law gives no sanction to so obvious an injustice as would result if the owner were held to forfeit all those elements of value."

This language imports that the economic integrity of the individual whose property is condemned should be preserved and that, as a matter of justice, the Assembled Industrial Plant Doctrine should be applied to the facts presented in this case. We agree with the court below that the evidence warranted the conclusion that the machinery involved was vital to the business operation and was a permanent installation. Compare, *United States v. Certain Property etc.*, 344 F. 2d 142 (2d Cir. 1965), and *United States v. General Motors Corp.*, 323 U.S. 373, at 383-384 (1945). See also 29A C.J.S., Eminent Domain §175(1) (1965), and 18 Am. Jur., Eminent Domain §253, page 892 (1938).

The Authority next contends that irrelevant testimony concerning zoning regulations was permitted at trial. This established that use of the Stoddard System was in violation of the existing zoning code, but had been permitted at the condemned site as a legal nonconforming use. However, since the new business address, six blocks away, was in the same zoning district, the zoning code would not permit the Stoddard System to be used at this location. This evidence tended to support the conclusion that the machinery was intended for permanent use at the condemned property and hence had an evidentiary purpose. Zoning regulations are a proper consideration in condemnation cases and the witnesses involved were competent to testify thereto. See, *Snyder v. Comm.*, 412 Pa. 15, 192 A. 2d 650 (1963).

Moreover, the fact that we have held against the Authority on the Assembled Industrial Plant Doctrine

issue renders the zoning testimony herein harmless. That is to say, the fact that the doctrine applies in the instant case makes the question of the restrictive zoning evidence moot since the Gottuses would have been compensated for the equipment in any event.

The Authority finally argues that the court below committed reversible error when it permitted an expert witness to testify on behalf of the owners about the sales price of a vacant lot sold about nine and a quarter years prior to the condemnation. The expert witness, McGrath, testified that he considered this sale as comparable and that he therefore examined it, as well as every other sale in the immediate vicinity, in his attempt to assess the value of Gottuses' property. The Authority's expert witness, Kelly, had previously testified that there had been no substantial change in real estate prices in the pertinent locale "within recent years."

The admissibility of this type of evidence falls squarely within the discretion of the trial court and the trial court's action in admitting such evidence should not be disturbed unless such discretion was grossly abused. *Snyder v. Comm.*, supra; *B. & K. Inc. v. Commonwealth,* 398 Pa. 518, 522, 159 A. 2d 206, 209 (1960). We cannot say that the trial court abused its discretion when the expert witnesses state that the properties were comparable and that prices in real estate had remained substantially constant over a period of years in the immediate vicinity.

Moreover, the question of remoteness generally goes to the weight of the evidence rather than to its competency. See Henry, Pennsylvania Evidence §30 n.43 (4th ed. 1953), and cases cited therein. Compare Annot., 55 A.L.R. 2d 791 (1957).

For these reasons the admission of the comparable sale testimony was proper.

Judgment affirmed.

Mr. Justice COHEN concurs in the result.