MASHETER, DIR. OF HIGHWAYS, APPELLANT, *v.* BOEHM ET AL., APPELLEES.

44

(No. 32007—Decided April 26, 1973.)

*Mr. William J. Brown,* attorney general, and *Mr. Alan M. Wolk,* for appellant.

*Messrs. Merkel, Campbell, Dill & Zetzer, Mr. Michael T. Gavin, Mr. Eli Manos,* and *Messrs. Marshman, Seeley & Snyder,* for appellees.

SILBERT, J. This is an appeal in a land appropriation case. Appellant as Director of Highways (hereafter also referred to as "the state"), brought this proceeding to appropriate premises owned and used by the appellees in the manufacture of pressed steel parts, a manufacturing operation requiring the use of a variety of heavy machinery located on the subject property. The land is needed for the construction of Interstate 90.

The state presents two assignments of error, complaining that the probate court erroneously: (1) found and instructed the jury that certain items were to be classified as fixtures, and were to be included in its valuation, and (2) refused to give a special instruction excluding moving and rehousing costs, and loss of profit, business or goodwill as noncompensable. The court permitted no evidence of such costs, or losses, *per se,* so that the second assignment of error is but filigree to the first—in counsel's view both are interrelated, that the first, if permitted, is to effect what is sought to be avoided by the second.

There was no dispute as to the evidence, insofar as it

reflects on the relationship between the chattel and real property. It is conceded that the buildings are taken. But they were designed and constructed around the larger equipment, or modified to accommodate it. Special floors were installed. Holes were cut in the roofs. Extensive engineering was undertaken in laying out and adapting the premises to appellees' particular business needs. The well over one hundred items in dispute can be roughly classified as follows: (1) heavy machinery implanted in concrete, underground storage tanks, a compressed air distribution system, and a spray booth built into the structures, and material handling equipment with tracks built into and made part of the building construction, including the moving parts thereof, (2) heavy machinery, furnaces, scales, air compressors, custom made storage racks, and other material handling equipment with tracks bolted to the buildings or to their foundations, and, where appropriate, permanently connected to service lines of one sort or another, (3) heavy machinery affixed by its own weight resting on specially prepared foundations, generally connected to service lines in a permanent fashion, (4) lighter movable equipment used in conjunction with the equipment already mentioned, as a part of the integrated operation of the plant, and comprised of (a) machinery designed or modified by the appellees to meet particular operating requirements, as well as (b) machinery generally available on the market, (5) spare parts for many of the more important pieces of equipment, stocked to avoid prolonged shutdown in the event of failure, and (6) special tooling and dies and support equipment attached to various pieces of this machinery when needed for particular manufacturing purposes. The appellees have not sought to include office equipment, products in process on the date of the take, or equipment not in their view functionally interdependent as part of plant operation.

The dispute is important not only to the parties, but because it involves substantial issues of first impression in Ohio. Both parties invoke the language of the law of fixtures, but both have staked out positions which challenge

or transcend the traditional boundaries of that branch of the law, while the extent to which the doctrine is itself applicable to an appropriation case has never been fully determined.

The state is willing to use the law of fixtures so long as it suits its purposes, but the gravamen of its complaint is that the classic definition of a fixture is inadequate, and overly loose. In its view such property is not taken if it "can be removed without substantial [physical] injury either to the real estate or to the article," a rule which finds little justification in the modern law of fixtures, but is borrowed from the decisions of courts outside Ohio— a rule principally supported by the specific construction given certain statutes, inapplicable in the case at bar, possibly interpreted without regard to resulting constitutional complications. *Futrovsky* v. *United States* (C. A., D. C., 1933), 66 F. 2d 215; Act of May 25, 1926, c. 380, Sec. 1, 44 Stat. 630, as amended, 40 U. S. C. Sec. 341, repealed by Act of Sept. 9, 1959, Pub. L. 86-249, 73 Stat. 479, 486, and replaced by significantly broader authorization now found at 40 U. S. C., Sec. 602; followed in *Potomac Electric Power Co.* v. *U. S.* (C. A., D. C., 1936), 85 F. 2d 243, cert. den. 299 U. S. 565, 81 L. Ed. 416; but, *cf.*, *Certain Land* v. *U. S.* (C. A., D. C., 1965), 355 F. 2d 825. Contrast *General Motors Corp.* v. *U. S., infra.*

The state concedes that at least some of the disputed property would satisfy its test, but suggests that the appellees have failed to meet their burden of proof by failing to show which items could not have been removed without substantial damage. The state further contends the issue should at least have been submitted to the jury.

The appellees maintain that all of the items in question are fixtures, taken as a matter of law. Their position, too, finds support outside Ohio. Pennsylvania has long embraced the view that an assembled industrial plant can be treated as a fixture, in the composite sense, and has recently held that it should be, for all purposes, including appropriation cases. *Gottus* v. *Allegheny County Redevelopment Authority* (1967), 425 Pa. 584, discussed in 13 Vill.

L. Rev. 218 (1968). Michigan has held that even liquids contained in vats can be treated as constructively attached, at least where the containers were comparatively worthless without their contents. Such liquids acquire the status of fixtures for the purpose of assessing damages as permitted under the Michigan law of eminent domain. *In re Slum Clearance* (1952), 332 Mich. 485, but, *cf., In Re Civic Center* (1953), 335 Mich. 528, 537-538. New York is said to take a broad view of the problem, at least as to property which can be classified as "trade fixtures," and it has been held that "* * * an award * * * may * * * be made for property, albeit readily removable without damage to the freehold, if such property were used for business purposes and would lose substantially all its value after severance." *Matter of New York City (Seward Park Slum Clearance Project)* (1st Div., 1960), 10 App. Div. 2d 498, 500. See Sackman, Fixtures in Condemnation—Concepts New and Old, Institute on Eminent Domain (1964), Southwestern Legal Foundation, Matthew Bender & Co., Dallas; *cf., United States* v. *Certain Property* (C. C. A., 2, 1962), 306 F. 2d 439, and discussion in *Marraro* v. *New York* (1963), 12 N. Y. 2d 285.

Of the three criteria defining a fixture set forth in *Teaff* v. *Hewitt* (1853), 1 Ohio St. 511, (1) annexation to the land, (2) application to the use to which the realty is dedicated, and (3) an intent to make a permanent accession to the freehold, intent is the most significant—not an intent to abandon, or not abandon the property, later formed, but an intent presumed to have existed when the annexation was made, and inferred from the nature of the chattel, the manner of affixation, and the underlying purpose for making the annexation. Actual intent may be immaterial. *Holland Furnace Co.* v. *Trumbull Savings & Loan Co.* (1939), 135 Ohio St. 48. Physical connection may be slight. *Merchants & Mechanics Federal Savings & Loan Ass'n.* v. *Herald* (Clark Co., 1964), 120 Ohio App. 115; *cf., Zangerle* v. *Standard Oil Co.* (1945), 144 Ohio St. 506. The chattel may be bolted or screwed in place, and we may assume, *arguendo,* that the object's own weight might be quite

enough, as if, *e. g.*, a house were found to be simply resting on its foundation. A part may not be physically attached to a machine, but belong to it, and be included with it as realty for some purpose or another. A machine is not less a fixture because, having a limited life, it may have to be eventually replaced, or substantially overhauled. *Cf.*, the facts in the *Holland Furnace* case, just cited. But the criteria "of a fixture applicable to machinery in a mill or manufactory is not different from that which applies to articles affixed to the freehold in any other situation." *Teaff* v. *Hewitt, supra*, at 512. The notion that an item can be treated as a "trade fixture" has never gained much recognition in Ohio. *Cf.*, the cases cited in 20 O. Jur. 2d, Fixtures, §29. Nor have we embraced the so-called assembled plant doctrine. *Cf.*, para. 4 of the syllabus in *Zangerle* v. *Standard Oil Co., supra.*

The foundation upon which the state has built its position is surely correct. "* * * to have any valid claim against the state to be compensated for * * * property, it must appear that such property was taken by the state." *Ohio Valley Advertising Corp.* v. *Linzell* (1958), 168 Ohio St. 259, syl., para. 1. Neither fixtures, nor structures of any sort are mentioned in the resolution to appropriate, as adopted by the Director of Highways, which expressly appropriates nothing beyond the fee simple interest in the land, and all rights or easements as may exist or be created in its proposed improvement. The word "fixture" does not appear in any of the pertinent provisions of the Revised Code, nor in the Ohio, or federal constitutions. Const. of the United States, Fifth and Fourteenth Amend.; Ohio Const., Art. 1, Sec. 19; R. C. Chapters 163, 5501, and 5519. (Neither party relied on those provisions of the Revised Code adopted to conform Ohio law to the requirements of the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970. Act of Jan. 2, 1971, Pub. L. 91-646, 84 Stat. 1894; 134 Ohio Laws H. 295. In our view the result reached herein is consistent with those provisions, see *e. g.*, R. C. 163.59(H) and (I) and R. C. 163.60 (A), and is only reinforced by them, but we do not include a consideration of them, *per se*.)

There has been a kind of inexorable plausability to the argument that since the state stands to its condemnees as buyer to seller, it is required to take fixtures in an appropriation case because *and only because* they are a part of the realty. Cf. *Marraro* v. *New York, supra* (12 N. Y. 2d 285). The temptation to reach for the easy pigeonhole has generally proved too great to resist. 2 Nichols on Eminent Domain, §583 *et seq.*, and cases cited therein.

The law of fixtures evolved as an exception to the common law rule that everything attached to the freehold was deemed to be a part of it, an exception born of a desire to protect the holder of a less than freehold interest who made improvements which he would otherwise be required to surrender. He could abandon his property, but he had only to relinquish that which could not be removed without injury to what necessarily passed with the fee. See, *e. g., id.,* at §583.

Later the doctrine was extended to cases brought by creditors, and to disputes between grantors and grantees. See, *e. g., Teaff* v. *Hewitt, supra* (1 Ohio St. 511). Only then did it begin to assume its modern form. A vendee's title could not be subject to something so indemonstrable as his vendor's unexpressed will. The rights of creditors could not be founded on the vicissitudes of a debtor's election at the end of a tenancy which had perhaps not come, and over property to which he may have forfeited all right of control. *Cf.*, again, *Holland Furnace Co.* v. *Trumbull Savings and Loan, supra* (135 Ohio St. 48).

In determining the award in an appropriation case, we are confronted by parties trying to disclaim ownership. In the usual fixture case litigation results because the parties or others through whom they claim have failed to provide otherwise by agreement, perforce electing to be bound by the common law. *Cf., e. g., G. L. Silberman & Co.* v. *Acme House Wrecking Co.* (Cuyahoga Co., 1928), 7 Ohio Law Abs. 471. The state stands to its condemnees as buyer to seller. If we are unwilling to ask what a willing seller would insist on selling, we must at least have the wisdom to admit that the analogy is to that extent inappropriate. *Cf., General Motors Corp.* v. *U. S.* (C. A., D. C., 1944), 140

F. 2d 873, 878-879, modified and as modified, aff'd., 323 U. S. 373.

An appropriation proceeding is a single case, in the nature of a proceeding *in rem,* in which compensation is assessed with regard to that part of the land actually acquired. Owners of separate interests, or whose rights are adversely affected *vis-a-vis* one another, can only look to each other for an adjustment of their claims, out of the award finally made, or otherwise. *Sowers* v. *Schaeffer* (two cases), 155 Ohio St. 454 (1951), and 152 Ohio St. 65 (1949); *Board of County Commissioners* v. *Thormyer* (1959), 169 Ohio St. 291; *cf., Hughes* v. *Cincinnati* (1964), 175 Ohio St. 381; *Ohio Valley Advertising Corp.* v. *Linzell* (1958), *supra,* and *Ohio Sand and Gravel Co.* v. *Masheter* (1964), 176 Ohio St. 327. Appropriate as the law of fixtures may be in determining the respective rights of multiple claimants to share in an award once made, the applicability of the same principles in determining the award itself is at most but a consequence of the condemnees' constitutional and statutory right to just compensation. That the law of fixtures has been applied in certain types of tax cases is not conclusive of the construction to be given constitutional and statutory provisions meant to deal with a wholly different type of problem. *Cf., Zangerle* v. *Standard Oil Co., supra* (144 Ohio St. 506).

Where our sister states have assumed that the scope of an appropriation is to be determined by looking to the law of fixtures, they have nevertheless been hestitant to award less than just compensation. *Cf., In re Slum Clearance, supra* (332 Mich. 485). The common law is molded to serve a constitutional standard imposed on a class of cases largely dissimilar from that with which that branch of the law evolved, and which must remain its principal *raison d'etre.* It is unfortunate enough that every fixture case must be decided on its own facts, without using that rationale to cloak a tacit recognition that different rules are necessary to decide essentially different cases, or even what may be substantially different facits of a single piece of litigation. See, *e. g., Marraro* v. *New York, supra* (12 N. Y. 2d

285), and, esp., *United States* v. *Certain Property, supra* (306 F. 2d 439), at 453.

In *Jackson* v. *State* (1914), 213 N. Y. 34, the state appropriated land and the building located on it, but rejected machinery installed in the building in connection with its use as a warehouse. Writing for a unanimous court, Judge Cardozo declared:

"We think that the power of the state is not so great, nor the plight of the citizen so helpless. Condemnation is an enforced sale * * *. It is intolerable that the State, after condemning a factory or warehouse, should surrender to the owner a stock of second-hand machinery and in so doing discharge the full measure of its duty. Severed from the building, such machinery commands only the prices of second-hand articles; attached to a going plant, it may produce an enhancement of value as great as it did when new. The law gives no sanction to so obvious an injustice as would result if the owner were held to forfeit all these elements of value. * * *." *Id.*, at 35.

If anything be constitutionally protected it is the economic aspect of the interrelationship between the chattels and the land which is secure. As noted by Judge Williams in *Smith* v. *Erie Rd. Co.* (1938), 134 Ohio St. 135, 142:

"In some of the early cases in this country, the courts, adhering to the conception of property as the thing owned, construed * * * [constitutional language as requiring] a 'taking altogether,' an appropriation and dispossession of the owner, which deprived him of the corpus of the property * * *. The broader view, which now obtains generally, conceives property to be the interest of the owner in the thing owned, and the ownership to afford the owner the rights of use, exclusion *and disposition.* Under this broad construction there need not be a physical taking of the property or even dispossession; *any substantial interference with the elemental rights growing out of ownership of private property is considered a taking.*" (Emphasis added.)

Here, as in *Jackson,* the act of appropriation itself amounts to a substantial interference with the appellees'

right to dispose of their property. They are denied the right to sell the whole as one when they would be foolish to sell it any other way.

Altogether, the jury awarded a compensation of $1,-791,465.00. The difference between the estimates of the several appraisers called by both sides amounted to something on the order of one million dollars. The state did not call witnesses with specialized experience with the kind of industrial operation carried on here. It seems clear from the verdict that the jury agreed with the appellees that the value of the whole was substantially greater than the mere sum of only some of its parts.

It is deceptively simple to talk about reproducing plant layout without recognizing that its utility reflects a considerable investment made to adapt a particular piece of realty to maximize the use to which it has been put. It is equally misleading to suppose that the in place value of the machinery is but its secondhand value plus initial assembly costs. The state does not buy an automobile without expecting to pay the engineering and management costs reflected in its design and fabrication, including costs incurred in isolating and correcting defects in the product. The appellees cannot do so either.

Their equipment is generally not new, but ranges in age, the various pieces having been acquired gradually over the life of the company. The whole may be characterized by comparing each piece with the separate parts of a single all-encompassing machine capable of producing a variety of products when operated by many individual operators. Individual pieces are not used separately, but together, sequentially, to perform the series of operations necessary to produce a single end product. The relationship of the parts to each other is as important as the proper functioning of each piece separately. The equipment must be well maintained, being overhauled when necessary to keep it productive to commercial tolerances. For the same reason, appellees maintain reserve equipment, and spare parts, including the equipment required to handle those parts and make needed repairs themselves. Years of

labor have been invested in achieving and maintaining proper alignment, and in planning and developing a plant layout which permits the same equipment to be used in the production of a number of dissimilar products while maximizing production time and minimizing material handling and labor costs.

Article I, Section 19 of the Ohio Constitution, prohibits a taking of property without compensation—what we will loosely refer to as a *de facto* taking (to distinguish the manner of taking from the usual measure of recovery in such cases, *i. e.*, to avoid using the term *"pro tanto"* for a dual purpose)—and mandamus will lie in such a case to compel the Director of Highways, or other public authorities, to institute appropriate legal proceedings. *State, ex rel. McKay*, v. *Kauer* (1951), 156 Ohio St. 347; *Crawford* v. *Delaware* (1857), 7 Ohio St. 459. Unlike provisions found in the constitutions of some of our sister states, Article I, Section 19, does not extend to damages in the general sense of that term. *McKee* v. *Akron* (1964), 176 Ohio St. 282. Relocation expenses cannot be recovered merely because they are incidental to a constitutional taking. *Thormyer* v. *Joseph Evans Ice Cream Co.* (1958), 167 Ohio St. 463. "Damages" has a particular meaning in this branch of the law—a meaning more or less concomitant to the idea of a taking *pro tanto, i. e.*, for so much as is taken in fact. *Cf., Smith* v. *Erie Rd. Co., supra* (134 Ohio St. 135). The landowner is entitled to compensation for what is taken, directly, and for damages to the residue.

Cases involving damages to residual land pose a significant analogue to our problem. The applicable rules are simply stated.

"Even if the owner's land is divided * * * in such manner as might otherwise raise * * * [an] issue of separateness, if he is devoting the parts to a single use, and they lie in such proximity as to be in effect *united by that use into a single property, they will be regarded as a whole* for the purpose of assessing * * * [compensation]." Annotation, 6 A. L. R. 2d 1197, 1202. (Emphasis added.)

Unity of use is the principal test. *Deercreek Local*

*Board* v. *Payne* (Madison Co., 1949), 86 Ohio App. 319; *cf., Seither* v. *Cleveland* (Cuyahoga Co., 1909), 17 O. C. C. N. S. 552, 42 O. C. C. 288, affirmed, 86 Ohio St. 357. There must be such a connection or relation of adaptation, convenience, and actual and permanent use between the two properties as to make the enjoyment of that taken reasonably and substantially necessary to the enjoyment of that left, in the most advantageous manner for which it is used. Anno., *supra,* at 1202-1203.

That is only to say that the scope of a condemnation proceeding is limited accordingly. Other property may be affected by construction of the improvement. It would have to be made subject to a second proceeding. *Cf., State, ex rel. McKay,* v. *Kauer, supra.* Within the limitation, however,

"In the case of operating manufacturing and industrial plants consisting of a congeries of properties actively serving the common purpose, the unity of use is apparent and * * * clearly supports a claim for injury * * * despite some nominal separation * * * [of the properties]." Anno., *supra,* at 1230.

Thus we take up consideration of the so-called rule that "a taking under the power of eminent domain does not include * * * personal property lying on the premises taken but not affixed thereto * * *," a rule finding its principal Ohio support in Judge Stewart's opinion in *Lucas* v. *Carney* (1958), 167 Ohio St. 416, 424. In his view, the rule was but a reflection of the fact that "* * * in an appropriation proceeding the specific property taken is designated and all other property is excluded * * *," again a rule limiting the scope of a particular form of proceeding, not one excluding recovery, *per se.* The use of land owned by the county resulted in an encroachment upon neighboring property, depriving the owners of the adjoining property of its use, so that "* * * to that extent that property * * * [was] taken *pro tanto,* not only as to the realty, *but as to the personal property rightfully thereon*" (emphasis partially added), and the court so held. *Id.,* at 425.

We agree that "mere" personal property is not taken in a proceeding to appropriate land, without more.

"In regard to personal property, no question can *ordinarily* arise. It is seldom necessary to take it, but if appropriated it is *taken;* if not appropriated, *it can be removed beyond the influence of any particular improvement and so escape the deterioration or injury it might otherwise sustain.*" Lewis on Eminent Domain (3 Ed.), 51, Sec. 62 (1909). (Emphasis partially added.)

The assumption fails if the property could not, or need not be removed before it, and the land, are taken by encroachment. *Cf., Lucas* v. *Carney, supra.* And it fails too, if removal would of itself substantially impair its value.

To the extent that value is consequently impaired, we agree with the view of the late Chief Justice Taft that a viable distinction cannot be drawn between rights in an encroachment case, and rights where property is affected by the appropriation of land with which it has been associated. *Thormyer* v. *Joseph Evans Ice Cream Co., supra* (167 Ohio St. 463), concurring opinion, at 469, 470. Whether relief is available or not, appropriation can be handled as a single proceeding only if it would bar any subsequent claim of encroachment, a result which can be obtained only if all of the issues can be considered, and resolved, together. *Cf., Chespeake & Hocking Ry. Co.* v. *Snyder* (Ross Co., 1931), 38 Ohio App. 279.

Where chattel property is united to the land by use so that the two are rendered, in effect, a single property, it can make no sense to treat the taking of chattels except as falling within the scope of the land appropriation case. Correspondingly, severance of the chattels may under these same circumstances result in a substantial interference with any right to dispose of the two together, a destruction of value reflecting the necessity of the one to the enjoyment of the other, resulting in a taking within the rule outlined in the *Erie Road* case. *Smith* v. *Erie Rd. Co., supra* (134 Ohio St. 135), at 142; approved in *State, ex rel. McKay,* v. *Kauer, supra* (156 Ohio St. 347).

It may appear at first blush that chattel property could be wholly treated as residue, allowing compensation for the difference between fair market value in place, before and after the take. The owner of residual land is left to dispose of it himself. *Lucas* v. *Carney* spoke only of a *pro tanto* taking of personal property. *Lucas* v. *Carney, supra* (167 Ohio St. 416). Property is taken by the appropriation of land because it is united with it by use; damage is allowed to the residue of a single tract only under the same circumstances.

A landowner who elects to move his chattel property treats it as not includable, but he voluntarily assumes this burden only if he is not forced to do so. Outright acquisition of chattels has the dual advantage of combining fair treatment with conceptual simplicity. The state is left to decide what it will do with its newly acquired assets. How it uses them is its business; it is of no concern to the condemnee. Title passes to the state, while the problem of removing the chattels does not devolve upon their former owner. He is paid the value of his property for its highest and best use, and that is the end of it.

"It is altogether another matter when the Government does not take [the condemee's] entire interest, but * * * chops it into bits, of which it takes only what it wants * * * and leaves him holding the remainder, which may then be altogether useless to him * * *. This is neither the 'taking' nor the 'just compensation' the Fifth Amendment contemplates." *United States* v. *General Motors Corp.* (1945), 323 U. S. 373, 382, 89 L. Ed. 311.

Residual land can be used or sold in place. It may not remain adaptable to the owner's needs, but he is not forced to dispose of it. The owner of chattel property would have to make immediate arrangements for its disposition—relocating, storing it, or selling it in place to a buyer who would take it away himself. He will argue that the value of the residue is not its value on the open market, but only that lower price a speculator would be willing to pay at a forced sale. Were we to attempt to limit recovery, we would only immeasurably complicate the already difficult task the

jury is asked to perform. *Cf.*, Judge Taft's rationale in *Queen City Realty Co.* v. *Linzell* (1957), 166 Ohio St. 249, 253; *Board of County Commissioners* v. *Thormyer* (1959), 169 Ohio St. 291, 297. The owner of residual land is compensated for the actual value he loses. *Cincinnati & S. Ry. Co.* v. *Longworth* (1876), 30 Ohio St. 108; *cf.*, *Gano* v. *Cleveland, C., C. & St. Louis Ry. Co.* (Hamilton Co., 1929), 33 Ohio App. 142.

*Lucas* v. *Carney* involved a taking by encroachment, not in fee. The court was not actually required to determine the measure of compensation—only that the claim was good as against a demurrer. Assuming the court meant to reach this far, it is not clear that it meant to do more than require a distinction be drawn between those items of personalty affected by the encroachment, and those not affected.

Broadly speaking, the issue is not who should pay for removing chattel property, but who should bear the burden of doing so? The law does not envision requiring a homeowner to take his house with him because the state is only interested in the land upon which it has been situated. It may be feasible to move it. It may have substantial residual value.

An appropriation of the nexus existing between chattel and real property imports the substance of a conversion. More specifically, we are not interested in trover as a form of action, but rather in the law's refusal to recognize any right to return the property once converted. As Lord Mansfield pointed out, "Trover is in the form of a tort, but in substance an action to try property." *Hambly* v. *Trott* (1776), 98 Eng. Rep. 1136, 1137. It was founded on the claim that property was lost, and not returned upon demand, allegations in time recognized as non-traversable, because to allow the defendant to refute the claim was to deny the usefulness of the remedy. Koffler and Reppy, Handbook of Common Law Pleading (1969), §99, p. 209, *et seq.*; Bowers, A Treatise on the Law of Conversion (1917), Little Brown & Co., Boston, ch. I and IX. *Collins* v. *Skillen* (1865), 16 Ohio St. 382, 387. Save as inapposite here,

it is of no consequence that property is innocently taken. *Railroad Co.* v. *O'Donnell* (1892), 49 Ohio St. 489, 501; *Fulks* v. *Fulks* (Lawrence Co., 1953), 95 Ohio App. 515. The owner of property severed from the land and carried away by another can recover the property *in specie*, and damages, or waive his right to do so, and recover its value at the time of its taking. *Keys* v. *Pittsburg & Wheeling Coal Co.* (1898), 58 Ohio St. 246; *Railroad Co.* v. *Hutchins* (1881), 37 Ohio St. 282.

Appropriation works a constructive severance. There is no asportation, but actual removal of the chattel from the land seems essential only because it is necessary that the property be removed from its owner's possession, while in a case such as that at bar title to the land is lost, the net result being the same, *i. e.*, the chattels are thereafter found upon land belonging to someone else. (As to asportation, see Koffler and Reppy, *supra,* §98, and at fn. 8.)

That someone else is the state, but we fail to see how its status should be deemed to allow it a defense denied a private citizen under substantially comparable circumstances. Nor do we share Judge Taft's fear that the *Lucas* v. *Carney* and *Joseph Evans Ice Cream* cases are inconsistent. See concurring opinion in the latter, *supra* (167 Ohio St. 463), at 469. If the nexus existing between the chattel and the land is severed, and the chattel treated as "taken," *i. e.*, retained, by the condemnee, there can be no recovery for its removal because such costs are *damnum absque injuria*, and perhaps for the reason, ultimately, that the state has not consented to be sued, and at least to the extent that it has not given that assent. *Cf., State, ex rel. Fejes,* v. *Akron* (1966), 5 Ohio St. 2d 47, and Judge Zimmerman's rather terse dissent in *State, ex rel. Royal,* v. *Columbus* (1965), 3 Ohio St. 2d 154, 159. Quite a different situation is presented if the nexus remains, for if the state wishes to take title to the land, it may have to *take* at least an equal interest in the chattel, too, and to make compensation for it.

The state's status may preclude liability in certain cases, and prevent its being sued without its consent. *Raud-*

*abaugh* v. *State* (1917), 96 Ohio St. 513. It is not a wall which its officers can throw up at will, fencing out all but what they choose. *State, ex rel. McKay,* v. *Kauer, supra* (156 Ohio St. 347), 351. Sovereignty carries the presumption that the state means to act justly toward its citizens. *State, ex rel. Parrott,* v. *Bd. of Public Works* (1881), 36 Ohio St. 409, 414-415; *cf.,* Blackstone, Commentaries on the Laws of England (1771), Book III, ch. 4, pp. 47-48, and ch. 17, part I, pp. 254-257; *cf., id.,* Book I, ch. 7, part II, p. 246. Public officials can be prevented from committing a clear breach of their legal duty. *Columbia Life Ins. Co.* v. *Hess* (Hamilton Co., 1926), 28 Ohio App. 107, 115-116, aff'd., 116 Ohio St. 416. Mandamus lies to compel public officers to pay for what they take. *State, ex rel. McKay,* v. *Kauer, supra.* They shall not be heard to say that they meant less than to fully execute their public duty.

In the final analysis, we are no more willing than Judge Cardozo to believe that "so obvious an injustice" is intended as would surely result were we to assume that the state does not mean to acquire all that in fairness it should take, *i. e.,* all that is taken in the sight of the law. Appellant's resolution to appropriate the subject premises is construed accordingly.

Yet if the state is treated as having the right to declare what it will take, taking only that plus what it would not also exclude, the determination of the scope of an appropriation is primarily one of law, not fact. Assuming, *arguendo,* that the jury's constitutional functions would transcend its role as a board of lay assessors, charged with determining the reasonable value of the property taken, where there is no essential issue of material fact, there is nothing to be decided by the trier of fact, but at most a question of law to be determined by the court.

It follows that the probate court did not err in refusing to submit these issues to the jury. For the reasons given we are of the opinion that the court did not err in ruling that all of the items of property in issue were to be included within the appropriation as a matter of law. The requested instruction was no more than an abstract proposi-

tion of law. There was no duty to give it, and if given it would merely have invited speculation by the jury. Both of appellant's assignments of errors are overruled, and the judgment of the probate court must be, and is, affirmed.

*Judgment affirmed.*

DAY, J., concurs.

WASSERMAN, C. J., concurred in the decision and opinion in this case prior to his retirement, January 31, 1973.