## O'Malley Manufacturing Co. v. Scranton Redevelopment Authority

*Harry P. O'Neill, Kenowski and Kenowski,* and *Paul H. Price,* for condemnees.
*David B. Miller,* for condemnor.

KOSIK, *J.,* April 19, 1974 — This matter is before the court without a jury pursuant to an agreement between the parties.

The condemnor is the Redevelopment Authority of the City of Scranton (hereinafter referred to as "SRA") and the condemnees are the O'Malley Manufacturing Company, Edward G. O'Malley and Nance O'Malley, as their interests may appear, owners of the realty, and Alfred Peller and Sol Goosay, trading as Penn Auto Service & Supply Company, lessee of the premises.

The condemnation occurred on or about March 6, 1961, under the then existing power of municipalities to acquire land by eminent domain: Act of March 26, 1903, P.L. 63, sec. 1, as amended, 53 P.S. §1141, and the Act of May 24, 1945, P.L. 991, sec. 12, 35 P.S. §1712. The Eminent Domain Code of June 24, 1964, as amended, 26 P.S. §1-602 does not apply in this case: Dacar Chem. Prod. Company v. Allegheny County Redevelopment Authority, 425 Pa. 343, 228 A.2d 778 (1967).

The land in question consists of 1.46 acres improved with a series of structures from time to time, but consisting of one building in toto.

Penn Auto was in the business of auto-vehicular parts, rebuilding and remanufacturing of same. Incident to the business was a machine shop, welding and battery shop, along with an inventory

of parts which were sold at retail within a radius of 150 miles. Part of the business was to maintain a junkyard. The premises were leased free of any improvements in 1937. An original cinder-block building was constructed by the tenant, and was added to as the need arose. Penn Auto installed heavy machinery in the machine shop on extra-heavy concrete foundations. Utilities peculiar to the needs of the operation were installed at the expense of the lessee. The lease in question was dated in 1944, and ran for a term of five years, renewable for another three years. However, the tenancy continued after the written term on what appeared to be a like term basis, and allegedly for as long as Penn Auto wished to remain in business.

The land was so located that it was land-locked, and a right-of-way was secured from a railroad company which was terminable on 30 days notice. Also significant is the fact that the junkyard portion of the premises could not be otherwise relocated anywhere within the City of Scranton because of zoning regulation prohibitions adopted after Penn Auto established its business.

Prior to trial, it was stipulated by all parties that single damages would be determined for the entire premises, and that such damages would be prorated; two-thirds to Penn Auto, and one-third to the O'Malley interests. Since it was the position of the SRA that only the premises was condemned, we presume the stipulation to prorate damages between the owner and tenant was intended to eliminate severed valuations and damages.

Sol Goosay testified as an owner. He opined that the fair market value of the property is $520,205. This included the land, improvements, machinery

and items in stock.[1] Mr. Goosay testified that all the equipment and inventory could be moved. There was no evidence from Mr. Goosay as to Penn Auto's inability, plans or attempts at relocation of the business. There was no evidence that the efficiency of the equipment would be affected by its movement. Nor did he offer evidence as to the proportion the scrap or junkyard played in the business.

Condemnees offered the testimony of Morris Hoffman as an expert on value. Hoffman is engaged in a comparable business. While he did appraise such properties and going businesses, it was always done in connection with purchases made for himself. It was his opinion that the fair market value of the entire taking before condemnation, and unaffected thereby was $855,000. After condemnation, and affected thereby, he opined that the value was $455,000. We seriously question the competency of Mr. Hoffman as an expert witness. Be that as it may, we attach little credibility to his testimony because his opinion was based entirely on visual inspection, and without the benefit and knowledge of the amount of machinery, equipment and inventory on the premises. In addition, he admitted getting the land value utilized by him from the realtor expert used by the condemnees.

Casimir Nowicki, realtor, testified for the condemnees. In his opinion, the property was valued at $815,000 prior to condemnation, and unaffected thereby. The after value was $400,000, leaving a

---

1. It should be noted that after the condemnation, but before removal of Penn Auto, the entire premises was destroyed by fire. While this is the only evidence on the subject, we were led to believe the adjustment of losses is still in litigation.

fair market value for purposes of determining just compensation at $415,000. A partial breakdown of his figures reflects that he attributed a value of $46,000 to the building, and $25,400 to the land. In addition, he placed a value of $24,100 on the electrical system, water system and sewer lines which he characterized as being installed for a specialized business. Numerous photo exhibits clearly demonstrate that this is a business which was correctly described by Mr. Goosay. However, the photos do not support the characterization of Mr. Nowicki, which also lacks specificity. The value of a building tailored with an electrical input for industrial machinery should include that factor when an appraisal is made. There is no evidence that the electrical system or plumbing differed from any other comparable industrial building. There is nothing in the condemnees' evidence which persuades us that this business could not be relocated and continued as efficiently as it may have been since its inception.

The SRA called no witnesses, but it was stipulated that if its expert was called, he would testify that as of August 14, 1957, the land was valued at $3,000 and the building at $26,000. It is regrettable that SRA was not better prepared to offer evidence on the various aspects in the case.[2]

Condemnees predicate their case on the application of the Assembled Economic Unit Doctrine which got its impetus in Gottus v. Allegheny County Redevelopment Authority, 425 Pa. 584, 229 A.2d 869 (1967), when the court applied the

2. Immediately following the trial, we expressed a desire to hear the testimony of the SRA's expert, and any other evidence directed to the theory of the condemnees' basis for damages. No additional evidence was made available to us.

former Assembled Industrial Plant Doctrine to a retail cleaning business on the condemned premises. There, the business was housed in a building specially constructed for this purpose. The court permitted damages for the machinery because it was held to be vital to the business operation and was a permanent installation notwithstanding that it might be removed. Significantly, the court limited the application of the doctrine to the facts of the case before it. Also significant is the fact that the Supreme Court applied the doctrine at a time the 1964 Code was in effect, but to a pre-code condemnation. Later, in Singer v. Oil City Redevelopment Authority, 437 Pa. 55, 261 A.2d 594 (1970), the Supreme Court abolished the distinction between industrial and other business operations in determining whether machinery and equipment were to be included in a taking of realty. The court formulated the Assembled Economic Unit Doctrine as a supplement to the code, and stated that it would apply under certain stated conditions which differ from those considered in the application of the Assembled Industrial Plant Doctrine.

Under the 1964 Code, as amended, there is provision allowing damages for removing, transporting and reinstalling machinery, equipment and fixtures not forming part of the realty. Also damages for moving inventory, and loss of patronage through relocation. Since we have before us a pre-code condemnation, we could not permit the award of incidental damages, nor the application of the Assembled Economic Unit Doctrine under Singer, supra. See Dacar Chemical Prod. Company v. Redevelopment Authority, 6 Pa. Commonwealth Ct. 643, 298 A.2d 668 (1972). Regard-

less, nothing was moved in this case because of the intervening fire.

While the Commonwealth stated that Singer, supra, could not be applied to a pre-code condemnation, it followed Gottus, supra, and held that the Assembled Industrial Plant Doctrine could continue to be applied to such cases. Accordingly, under pre-code law the sole test was whether the machinery, equipment and fixtures in question were placed in the establishment for permanent and necessary use in the industrial operation. If they were, then regardless of the practicality of their removal or whether fast or loose, they were compensable as part of the realty.

Such would be the test in this case if the land owner also owned the business. An examination of the history of the Assembled Industrial Plant Doctrine commencing with Chief Justice Gibson's opinion in Voorhis v. Freeman, 2 W. & S. 116 (Pa., 1841), clearly establishes that machinery of a manufactory, whether fast or loose, must pass as part of the freehold. The opinion characterizes this concept as no more than an enlargement of the principle of constructive attachment. Significant, perhaps, is Chief Justice Gibson's limitation: "I speak not here of questions between tenant and landlord . . ." Our Supreme Court in Gottus, supra, cites Voorhis v. Freeman, and alludes to its growth and various applications before concluding that it had application to an owner who manufactory was condemned. Such is not the case with Penn Auto as a *tenant*. Nor do the decisions allude to the doctrine's application to a tenant. See also Leary, Financing New Machinery for Mortgaged Pennsylvania Industrial Plants, for a history of the doctrine, 4 Vill. L. Rev. 498 (1959), and Fixtures and

the Real Estate Mortgage, for the same reason, 97 U. Pa. L. Rev. 180 (1948). We think it would be a misapplication of the law to apply the Assembled Industrial Plant Doctrine to a pre-code condemnation in evaluating a tenant's damages, particularly when that tenant's machinery and fixtures are removable.

Although we have made references to the lease agreement earlier, we must note that by our calculation, the tenant was in the third year of its extended term at the time of condemnation on March 6, 1961. The lease could have been terminated by the lessor, or condemnor after the taking, on June 30, 1961.

Having determined that the Assembled Industrial Plant Doctrine is inapplicable, we must determine what damages, if any, a tenant may be entitled to beyond the damages for the building pursuant to the stipulation entered into when the trial commenced. As to pre-code authority, we find McMillin Printing Co. v. Pittsburgh, Carnegie & W. Railroad Co., 216 Pa. 504, 510, 65 Atl. 1001 (1907), holding that the decisions are not harmonious in awarding damages for the cost of removing machinery and losses resulting from business interruption. The court stated, on page 511:

". . . But market value is an unsatisfactory test of the value to a tenant of a leasehold interest. It is really no test at all, because a lease rarely has any market value. Generally, it is not assignable at the will of the tenant, and he pays in rent all that the right of occupation is worth. The right of which he is deprived and for which he is entitled to full compensation is the right to remain in undisturbed possession to the end of the term. The loss resulting from the deprivation of this right is what he is

entitled to recover. The value of the right he is forced to sell cannot ordinarily be measured by its market price, for there is no market for it, nor can it always be measured by the difference between the rent reserved and the rental value if the lease should be a favorable one. If, as was the case here, a tenant engaged in a business requiring the use of heavy machinery and appliances should secure a new place equally well adapted to his business and at the same rent, he would still be at the expense of removal and at a loss because of the stoppage of his business. *These are matters to be considered in connection with others, not as substantive elements of damage, but as tending to prove the value of the leasehold interest.*" (Emphasis supplied.)

Later, in Iron City Auto Co. v. Pittsburgh, 253 Pa. 478, 98 Atl. 679 (1916), the court reviewed numerous cases including McMillin, supra, for the proposition that the leasehold is to be valued taking into consideration the expense of moving machinery; not as a separate item of damage, but as a "proper element" in arriving at a value for the leasehold. In a summation of authorities on page 495, the court held that " '[t]he measure of damages in the case of an ordinary leasehold is the amount that any one would pay for the unexpired term over and above the rent and other charges' fixed in the contract of lease."

In our case, the condemnees have elected to predicate their claim on the applicability of the Assembled Industrial Plant Doctrine. Their evidence purports to seek an award on the basis of the doctrine. We have no evidence, other than the monthly rental of $175 during the remaining term of the lease, to be considered as proper elements in

the evaluation of the remainder leasehold interest. Accordingly, we shall enter an award based on the evidence before the court, and in conformity with the stipulation of the parties.

Condemnees are awarded damages in the amount of $33,000 with detention from the date of condemnation.

## OPINION SUR EXCEPTIONS

KOSIK, *J.,* February 12, 1975—This matter is before the court on the exceptions of Edward G. O'Malley, one of the condemnees, to the decision of the court filed on April 19, 1974.

While six exceptions were filed, the condemnee urges consideration of only two: The first being that ". . . the court erred in presuming that the stipulation by the parties to pro-rate damages between the owner and tenant was intended to eliminate severed valuations and damages." Second, that the ". . . stipulation intended to combine their interests in the land in order to prove damages under the theory of the Assembled Industrial Plant Doctrine. The court, however, in its decision treated their interests separately, but made no evaluation of the leasehold interest, and gave effect to the stipulation only for the purpose of dividing the award."

At the outset it should be noted that the stipulation between the parties provided that the ". . . trial will address itself to a valuation and determination of market value for the entire premises taken; that any award shall be pro-rated as follows: two-thirds of the award shall go to the interests of Alfred Peller and Sol Goosay, trading as Penn Auto Service & Supply Company; one-third shall go to Edward Gordon O'Malley and Nance

O'Malley, as their interests may appear; that the interests of Edward O'Malley and Nance O'Malley will not be resolved in this proceeding because their interests will not appear in this proceeding."

The evidence offered by all condemnees was predicated on the application of the pre-code Assembled Industrial Plant Doctrine (post-code Assembled Economic Unit Doctrine). For reasons given in the court's decision, neither doctrine was found applicable to the facts of this case. No exceptions exist to that ruling of the court.

In the circumstances, the trial court entered an award for the market value of the premises taken. Having rejected the condemnees' theory under the Assembled Industrial Plant Doctrine, there was no other evidence before the court on the issue of damages.

The aforesaid stipulation is not conditioned on the court's accepting the condemnees' theory for the award of damages. Nor do we believe this to have been the intent of the parties. In his brief, condemnee quotes the court's decision to the effect that the stipulation intended to eliminate "severed valuations and damages." Of course, such was the court's understanding.

Condemnee now urges that the tenant condemnee was not entitled to "severed valuations and damages, i.e.: the value of a building erected by him." This was never an issue in the case by reason of the stipulation.

Frankly, we believe that the condemnee finds himself disappointed with the award. As a result, he would have the court re-try the matter with the view of receiving an award in excess of the prorated ratio agreed to before the trial.

For reasons stated, we shall dismiss the exceptions.

## ORDER

Now, February 12, 1975, the exceptions of Edward G. O'Malley are dismissed.