Commonwealth of Pennsylvania, Department of Transportation, Appellant, *v.* Josephine Sapone, Appellee.

Argued October 7, 1974, before President Judge BOWMAN and Judges CRUMLISH, JR., WILKINSON, JR., MENCER, ROGERS and BLATT. Judge KRAMER did not participate.

*Lawrence R. Wiedner,* Assistant Attorney General with him *Robert W. Cunliffe,* Deputy Attorney General, and *Israel Packel,* Attorney General, for appellant.

*Raymond J. DeRaymond,* with him *George F. Coffin, Jr.* and *Coffin, DeRaymond, Shipman and Stitt,* for appellee.

OPINION BY JUDGE ROGERS, November 22, 1974:

The Commonwealth of Pennsylvania by the Department of Transportation has appealed from a judgment entered in Northampton County upon a jury verdict awarding damages to Josephine Sapone, a condemnee. The appellant contends that the trial judge erred in admitting into evidence the opinions of the condemnee's valuation experts that the highest and best reasonably available use of the condemned property before the condemnation was industrial because those opinions were, it asserts, based on sales of other properties not comparable to the one in suit.

We have carefully reviewed the trial record and have concluded that the following pertinent portions of the opinion of the court below accompanying its order dismissing the Commonwealth's motion for new trial correctly and adequately dispose of the issues raised in this appeal.

"The condemnee, Mrs. Josephine Sapone, owned a tract of land consisting of approximately 63 acres located entirely within the borough limits of Stockertown,

Northampton County, Pennsylvania. On June 16, 1969, the Commonwealth condemned 25.987 acres of Mrs. Sapone's land for the purpose of constructing Route 33, a four-lane, limited-access highway. A board of viewers was subsequently appointed; after conducting two views and after hearing testimony, the viewers filed their report in which they awarded the condemnee compensation in the sum of $32,000. An appeal was taken by the condemnee from the viewers' award. The trial of the case resulted in a verdict in favor of the condemnee in the sum of $52,598.

"The Commonwealth's principal contention in support of its motion for a new trial is that the condemnee failed to meet the burden of establishing that, at the time of the taking, the highest and best use of the condemned land was for industrial purposes. On the date of the condemnation and for the previous 46 years, the property was being used for residential and agricultural purposes. Nevertheless, two expert witnesses for the condemnee testified that, notwithstanding such use, the highest and best use of the property was for industrial purposes.

"It is well settled in Pennsylvania that condemnation damages need not be based upon the use currently being made of the condemnee's property if, in fact, its highest and best use is shown to be for some other more valuable purpose. Pennsylvania Gas and Water Company vs. Pennsylvania Turnpike Commission, 428 Pa. 74, 77 [236 A. 2d 112, 114] (1967). Recovery based upon a non-existing use, however, may not be based upon 'remote chances or future possibilities.' Stoner vs. Metropolitan Edison Company, 439 Pa. 333 [266 A. 2d 759] (1970). 'To prove a highest and best use the condemnee must establish that the land in question is physically adaptable to such use and that there is a need for such use in the area which is reflected in the market for the property at the time of the condemnation.' Condemna-

tion by the Pennsylvania Turnpike Commission, 1 [Pa.] Commonwealth Ct. 66 [272 A. 2d 279] (1970); Shillito vs. Metropolitan Edison Company, 434 Pa. 172 [252 A. 2d 650] (1969). The manner of establishing this need is by demonstrating that a demand for it exists in the public market at the time the condemnation occurred. Shillito, supra.

"The main question to be determined then is whether the condemnee demonstrated by sufficient evidence that (1) the property was physically suitable or adaptable for heavy industrial use and (2) there was a need in the area for heavy industrial use property at the time of the taking, i.e., June 16, 1969.

"The condemnee presented two expert witnesses, Jacob Seip and Lester Kilbanks. Their pertinent testimony with regard to suitability of the property for industrial use was as follows: Before the taking, the Sapone property was bounded on three sides by industrial property including a large industrial plant dump which bordered the property on the west. The property had access of about 120 feet on Route 115 and also access to Route 191, both of which are moderately traveled two-lane highways. The property was serviced by municipal water, heavy-duty electric power and a railroad spur of the Lehigh Valley Railroad Company. The size, shape, natural drainage and lack of severe grade were all additional positive factors towards a finding that the property was best suited for heavy industrial use. Finally, the Borough of Stockertown had no zoning ordinance; thus, no restrictions on industrial use were present as of June 16, 1969.

"The condemnee's experts also testified that in their opinion a demand for industrial use property in the Stockertown area existed and the demand was manifested by the fact that other users had constructed industrial parks and plants in the adjoining townships of Forks, Palmer and Lower Nazareth. The experts re-

ferred to six comparable sales to show that land in the immediate vicinity of the condemned property had been sold for industrial purposes. In the opinion of both experts, the highest and best use of the land prior to the taking was for industrial purposes.

"In order to determine the value of the Sapone property after the taking, the condemnee's experts considered the following factors: the total acreage of the property was reduced from 63 to 37; the remaining 37 acres were severed into two distinct portions, a 29.3 acre tract to the west of Route 33 and a 7.8 acre tract to the east; no access was available from one tract to the other unless public roads were used; the 7.8 acre tract was no longer attractive for heavy industrial use because of its configuration and size; the 29.3 acre tract was not as attractive for heavy industrial use as the original 63 acre tract because the railroad siding was not located on the 29.3 acres and municipal water was no longer available to it.

"Based on these factors, the condemnee's experts concluded that after the taking the highest and best use of the 7.8 acre tract was either limited light industrial, residential, or agrarian; and the highest and best use of the 29.3 acre tract was industrial. Seip then estimated the fair market value of the property at $190,000 before the taking and $107,100 after the taking, resulting in damages to condemnee of $82,900. Kilbanks' estimate of fair market value was $189,000 before the taking and $111,700 after the taking, resulting in damages of $77,300.

"The Commonwealth's expert, Robert Moore, testified that in his opinion the best and highest use of the property before the condemnation was for rural residential purposes. Moore stated that the property afforded poor or limited access to Routes 115 and 191 and that there was no demand for industrial property in Stockertown prior to the condemnation. Relying on two com-

parable sales of rural residential properties, Mr. Moore's estimate of the fair market value of the property before the taking was $65,000. Concluding that the construction of the new highway and interchange had changed the best and highest use of the property to commercial and industrial development, and basing his figures on three comparables in the area, Moore testified that the fair market value of the property was $105,000 after the taking; thus resulting in no damages to the condemnee because she was afforded special benefits as a result of the condemnation.

"It is clear that the experts for both the Commonwealth and the condemnee gave substantially similar fair market values to the property after the taking. It is also apparent from the size of the verdict that the jury chose to believe the condemnee's experts with regard to the highest and best use of the property at the time of the taking and we believe that their decision was not against the weight of the evidence.

"The Commonwealth argues that the trial court erred in admitting into evidence the six comparables used by the condemnee's experts to establish the value of the property at the time of the taking. Although section 705(2)(i) of the Eminent Domain Code (Act of June 22, 1964, P. L. 84, 26 P.S. §1-101 et seq.) provides that a valuation expert may testify as to the sale of comparable properties, the trial court must decide initially whether the sale is 'judicially comparable.' The Code does not set forth specific criteria to determine what is 'judicially comparable' except to restrict the evidence to comparable properties sold within '*a reasonable time before or after the date of condemnation*' (emphasis added) [Section 705, 26 P.S. §1-705(2)(i) (Supp. 1974-75)]. The trial judge here determined that the comparable sales referred to by the expert witnesses were 'judicially comparable.' This was a discretionary matter with the judge and, unless there is a manifest palpa-

ble abuse of discretion, the trial judge should be upheld. Arndt vs. Central Cambria School District, 7 [Pa.] Commonwealth Ct. 150, 159 [298 A. 2d 682, 686] (1972).

"The Commonwealth argues that five of the six comparables offered by the condemnee should not have been admitted into evidence either because the compared properties were too distant from the subject property or because the compared properties were sold after the date of condemnation and, thus, the market values were artificially inflated as a result of the condemnation. The Commonwealth's argument concerning the sixth comparable is that the sale was not an arm's length transaction as a matter of law and, therefore, was inadmissible.

"With respect to the fifth comparable, the *Sapone to Karch* sale of the 29.3 acre tract previously discussed, the Commonwealth did not object to the admission of that sale at trial and, in fact, the same sale was used by the Commonwealth as one of its three comparables to show the value of the property after the condemnation. Therefore, we dismiss the Commonwealth's post-trial objection to the admission of that comparable.

"The record indicates that none of the condemnee's comparables were more than three miles from the condemned property and all of them were substantially similar in physical characterization. The date of the sales ranged from six months to three years after the date of the taking. The comparables used by the Commonwealth to show post-condemnation value were located up to four miles from the subject property and the sales occurred from one year prior to the taking to three years after the date of taking. Reviewing the testimony of the expert witnesses for both sides, each of whom stated that his respective sales were comparable, we cannot say that the trial court abused its discretion when it admitted into evidence the comparables offered

by both the condemnee and the Commonwealth. *See* Gottus vs. Allegheny County Redevelopment Authority, 425 Pa. 584 [229 A. 2d 869] (1967); Bussell vs. Commonwealth of Pennsylvania, Department of Highways, 17 Chester 207 (1969). Moreover, the question of remoteness in time of the sales generally goes to the weight of the evidence rather than to its competency. Gottus, supra, at page 590 [229 A. 2d at 873]. See also Henry, Pennsylvania Evidence, 4th Edition, §30, note 43, and cases cited therein. Therefore, we reject the Commonwealth's argument that the condemnee's comparables were to remote either in time or distance to be 'judicially comparable.'

"Finally, with respect to the sixth comparable, *Easton Area Industrial Sites to Easton Area Industrial Development Company, Inc.,* the Commonwealth argues that the sale was not an arm's length transaction and thus should not have been admitted into evidence. The Commonwealth relies on the testimony of Mr. Kilbanks, who stated that the executive director of the grantor and grantee corporations was one and the same person. However, Mr. Kilbanks also testified that the fact that the same people may have been involved was not an important consideration because the sale was actually made for the benefit of Binney & Smith Corporation. According to Kilbanks, a recorded agreement provided that an industrial plant would be built and leased to Binney & Smith for a 21-year term; that at the end of that period the ownership of that property would revert to Binney & Smith if they wanted ownership at that time; that the sale would not have occurred if there had not been an industrial buyer such as Binney & Smith to pay all the expenses of this type transaction; and that Binney & Smith had the same amount of knowledge of the transaction involved as did the grantor and grantee corporations. In Kilbanks' opinion, the transaction was a free and open one conducted at arm's length.

402

"The trial judge ruled that it was a question of fact as to whether or not the *Easton Area Industrial Sites* sale actually was an arm's length transaction and thus allowed the jury to consider the testimony on that comparable. Once again, reviewing the record, we find that the trial court did not abuse its discretion in allowing the comparable into evidence."

Judgment affirmed.