**JACKSON v. UNITED STATES.**

No. 17859 Congressional.

United States Court of Claims.

April 8, 1952.

Ward E. Lattin, Washington, D. C., Gardner, Morrison & Rogers, Washington, D. C., on the brief, for plaintiff.

Wilson Myers, Washington, D. C., Holmes Baldridge, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

MADDEN, Judge.

This case has come to us pursuant to Senate Resolution 137, 81st Congress, which reads as follows:

"Resolved, That the bill (S. 2185) entitled 'For the relief of W. C. Jackson,' now pending in the Senate, together with all the accompanying papers, is hereby referred to the Court of Claims; and the court shall proceed with the same in accordance with the provisions of sections 1492 and 2509 of Title 28 of the United States Code and report to the Senate, at the earliest practicable date, giving such findings of fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand as a claim, legal or equitable, against the United States and the amount, if any, legally or equitably due from the United States to the claimant."

The present plaintiff is the administrator of the estate of W. C. Jackson, who filed the petition in this case but thereafter died on April 5, 1951. Hereinafter, for convenience of reference, the word plaintiff may be taken to mean either W. C. Jackson, during his lifetime, or his administrator.

For some years prior to 1941, the plaintiff was engaged in the commercial fishing business, operating off the eastern shore of Spesutie Island, in Chesapeake Bay, in Maryland. He used five separate pound nets at any one time, but kept nine such nets on hand. A Maryland statute, effective June 1, 1941, a fish conservation measure, required pound net fishermen operating in the Chesapeake Bay to take out

licenses. To obtain a license, one had to show that he had conducted commercial fishing operations of that type during 1940 or 1941. If he had, he could obtain a license to use the number of nets he had actually used in the past. Licenses were to be for one year, but renewal was to be a matter of right, unless misconduct should occur justifying refusal of renewal. One who had a license, and the accompanying right of renewal, could sell or devise it, or let it pass to his estate upon his death. The plaintiff obtained a license in 1941 which he renewed in 1942 and 1943.

On February 19, 1943, the Government having leased Spesutie Island from its private owners, the Secretary of War, acting under authority of the Act of July 9, 1918, 33 U.S.C.A. § 3, redefined the restricted areas of the Aberdeen Proving Ground, Aberdeen, Maryland, by enlarging it to cover all of Spesutie Island and its adjacent waters to specified points. The newly defined area included the plaintiff's fishing grounds. On February 24, 1943, the Commanding General at the Proving Ground notified the plaintiff that he would no longer be permitted to place his fishing nets in these waters, and the plaintiff was obliged to give up his fishing operations in that area. He was unable to secure a license to fish elsewhere, all other locations having been appropriated by other fishermen. He asked for and received the Commanding Officer's permission to store his nets on the island, but at his own risk. While they were so stored, they were destroyed by fire, which was not the fault of anyone, so far as appears.

The primary issue, as stated by the plaintiff in his brief is:

"1. Did the action taken by the government in refusing to permit plaintiff to continue to conduct pound net fishing operations at his fishing grounds off the shore of Spesutie Island from and after February 24, 1943, constitute such a taking of a property right of the plaintiff as to entitle him, legally or equitably, to payment from the United States for the value of that which was taken?"

■ In a sense, what the plaintiff had before he was forbidden to fish was a property right. It had value, in that he made his living from it. So far as his relation to the State of Maryland was concerned, it had one quality of a property right, the quality of alienability. As to permanence, the State could, apparently, have changed its laws at will for the purpose of conserving its resources of fish. If the Government established a target range on its own land, but forbade farmers on adjacent farms to occupy and use their land because they might be hurt by stray bullets, or because they or their visitors might discover military secrets, the Government's action would constitute a taking. See Portsmouth Harbor Land & Hotel Co. v. United States, 56 Ct.Cl. 494; Id., 260 U.S. 327, 43 S.Ct. 135, 67 L.Ed. 287. The result would seem to be the same if the neighbor was disabled from making use of his land which was covered by navigable water, if his use, such as for fishing, did not interfere with navigation. While the Government may, to protect and improve navigability, forbid the private use of navigable waters, it may not do so for some other purpose not related to commerce. United States v. Gerlach Livestock Co., 339 U.S. 725, 70 S.Ct. 955, 94 L.Ed. 1231, affirming 76 F.Supp. 87, 111 Ct. Cl. 1, 69–72.

■ We think, therefore, that the plaintiff had a sort of property right in his fishing ground, and that the Government took that property from him. But the valuation of what was taken, for the purposes of just compensation, is difficult, for at least two reasons. The first is that he fished only by license from and at the suffrance of the State of Maryland, which could have changed its law at any time and refused him a further license. The second is the considerable fluctuation of the plaintiff's net income from his fishing, during the years before he was forbidden, and upon the basis of which his loss must be estimated. The best that can be done, in our opinion, is to make an estimate, in the nature of a jury verdict, of approximately what the plaintiff's rights and prospects

would have sold for in 1943. We fix that sum at $10,000. In addition, the plaintiff's nets were reduced to a second-hand value, by his being forbidden to use them. The fact that they were later destroyed by fire, without the fault of anyone, did not increase the Government's liability. But the taking of his fishing ground reduced their value by $1,500, for which he should be compensated.

It is our conclusion that the plaintiff has a legal and equitable claim against the United States for $11,500, plus, as a part of just compensation, interest at the rate of four percent per annum from February 24, 1943, and we so report to the Senate of the United States, pursuant to S.Res. 137, 81st Congress, First Session.

The foregoing special findings of fact, conclusion of law, and opinion, will be certified to the Senate of the United States, pursuant to S.Res. 137, 81st Congress, First Session.

JONES, Chief Judge, and HOWELL, WHITAKER, and LITTLETON, Judges, concur.