336 A.2d 249

**REDEVELOPMENT AUTHORITY OF the
CITY OF PHILADELPHIA**

v.

**Irwin LIEBERMAN t/a Hide-Away Bar,
Appellants-Condemnees.**

Supreme Court of Pennsylvania.

Argued Nov. 26, 1973.

Decided March 18, 1975.

Rehearing Denied May 2, 1975.

210

Austin Norris, Norris, Hutton & Wells, Philadelphia, for appellants.

Francis J. Moran, Philadelphia, for appellee, Redevelopment Authority, Philadelphia.

Before EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

OPINION OF THE COURT

MANDERINO, Justice.

In this appeal we must decide whether, in an eminent domain proceeding, a condemnee whose retail liquor li-

cense loses value as a result of the condemnation of the premises for which the license was issued, is entitled to have such loss considered in the award of just compensation to be paid by the condemnor.

Irwin Lieberman (condemnee) leased premises at 2–4 South Hicks Street, Philadelphia, in which he operated a licensed retail liquor establishment. The business had been operated at the same location by Lieberman and his father for thirty-five years. On January 30, 1969, the Redevelopment Authority of the City of Philadelphia (condemnor) condemned the premises. The condemnee, who was evicted from the premises on June 1, 1969, found it impossible to find a suitable new building for his bar business in any business area, shopping center, or residential district. He also unsuccessfully tried to sell the liquor license through several license brokers. The condemnee was therefore required to return the license to the Liquor Control Board. Subsequently, the license was cancelled.

On March 25, 1972, the Court of Common Pleas awarded damages of $35,000 for the value of the condemnee's machinery, equipment, fixtures, and liquor license. It also awarded $5,000 business dislocation damages. The total damages were $40,000. The Commonwealth Court disagreed with the trial court's conclusion that one element to be considered was the compensation due the condemnee for the loss in value of his liquor license sustained as a result of the condemnation, and held that the loss of value in the liquor license was not compensable. The trial court's order was therefore reversed and the case remanded for a new trial. This Court then granted the condemnee's petition for allowance of appeal.

The parties in this appeal do not disagree as to the constitutional standards applicable to this appeal. Under the federal constitution that standard is as follows:

"The Fifth Amendment provides that private property shall not be taken for public use without 'just

compensation.' 'And "just compensation" means the full monetary equivalent of the property taken. The owner is to be put in the same position monetarily as he would have occupied if his property had not been taken.' " (Citations omitted.)

*Almota Farmers E. & W. Co. v. United States,* 409 U. S. 470, 473–74, 93 S.Ct. 791, 794, 35 L.Ed.2d 1, 7 (1973).

The Pennsylvania Constitution requires the same standard. *See* Article I, Section 10 and Article X, Section 4 of the Pennsylvania Constitution, P.S.; *Pgh. Rwys. Co. v. Port of Alleg. Co. Auth.,* 415 Pa. 177, 202 A.2d 816 (1964); *Miller v. Beaver Falls,* 368 Pa. 189, 82 A.2d 34 (1951).

The parties disagree, however, as to what constitutes "property" as that term is used in the constitutional provisions mandating that property shall not be taken for public use without just compensation.

"Property" has been used over the years to describe both the physical object which is the subject of ownership, and to describe the aggregate of rights which an owner possesses in or with respect to the physical object. Nichols, in his treatise on Eminent Domain, quotes from authorities who have attempted to deal with the definition of property:

> "Both with lawyers and with laymen this term has no definite or stable connotation. Sometimes it is employed to indicate the physical object to which various legal rights, privileges, etc., relate; *then again—with far greater discrimination and accuracy—the word is used to denote the legal interest (aggregate of legal relations) appertaining to such physical object.* Frequently there is a rapid and falacious shift from the one meaning to the other. At times, also, the term is used in such a blended sense as to convey no definite meaning whatever." (Emphasis added.) (quoting

from Hohfeld, Fundamental Legal Conceptions as Applied in Judicial Reasoning (1923), n. 1 at page 28.)

.    .    .    .    .    .    .    .

"The integral or entire right of property includes four particulars: (1) Right of occupation. (2) Right of excluding others. (3) Right of disposition, or the right of transfering the integral right to other persons. (4) Right of transmission, in virtue of which the integral right is often transmitted after the death of the provider, without any disposition on his part, to those in whose possession he would have wished to place it." (quoting from 3 Bentham's Works 1893 ed. pg. 182.)

Nichols, The Law of Eminent Domain, Vol. 2, § 5.1[1] (1970).

Nichols then points out that according to Bentham's concept, the physical object (subject of property) is, when coupled with possession, merely the visible manifestation of invisible rights. "Property" is then composed of the rights of use, enjoyment, and disposition of such an object to the exclusion of all others. It consists not of unrestricted dominion, but of an aggregate of qualified privileges.

In his article "Legal Concepts in Cases of Eminent Domain" 41 Yale L.J. 221 (1931–32), Cormack said the following about these two uses of the word "property:"

"The usage first referred to may be described as the use of a physical concept, the latter of a mental. The one may be described as a concept of property as consisting of tangible physical objects, with which certain human beings are more or less intimately connected; the other is a concept of property as consisting of legal relation between human beings, some of which relations to a greater or less degree involve control over certain physical objects. In the use of the former concept the lawyer's mind is directed primarily toward things, in the latter toward human beings. The one

deals with material substances, the other with abstract conceptions. The one is objective, the other subjective." *Id.* at 223.

Cormack points out that "to take" means simply to acquire possession or custody when "property" is viewed from the physical object concept. When "property" is viewed from the standpoint of the mental or abstract concept, the meaning of "to take" is that expressed by Shakespeare, when, after the judgment of the court, the Merchant of Venice says:

"You take my house when you do take the prop

That doth sustain by house; you take my life

When you do take the means whereby I live."

(The Merchant of Venice, Act IV, Scene 1, line 375.)

The condemnee in this appeal expressed the same sentiments when testifying about his liquor license:

"The value of the liquor license represented to me the ability to do business there. Without it there was nothing there at all. So that the value of the liquor license became the amount of money I could get for the sale of the business less whatever equipment was worth."

■ The purpose of any eminent domain proceedings is to distribute throughout the community the loss inflicted upon an individual when the state takes his property for public use. The ideal to be sought therefore, is to award compensation that will put the injured party in as good a condition as he would have been if the condemnation proceedings had not occurred. The use of either concept of property would be adequate if it produced results consonant with that purpose. Early in the development of this country the physical concept of property proved adequate. As the years passed, however, the failure of cases applying this physical property concept to adequately compensate for serious losses produced a revolt against its use. Movement away from the physical

conception came slowly at first, but by 1872 the decision of the Supreme Court of New Hampshire, in *Eaton v. B. C. and M. R. R.*, 51 N.H. 504 (1872), had treated the eminent domain process as one of interference with valuable legal relations rather than strictly the taking of a physical piece of property. By 1874, the same court had applied the *Eaton* doctrine to a water overflow case saying:

> "Property in land must be considered, for many purposes, not as an absolute, unrestricted dominion, but as an *aggregation of qualified privileges,* the limits of which are prescribed by the equality of rights, and the correlation of rights and obligations necessary for the highest enjoyment of land by the entire community of proprietors. . . . Property is taken when any one of those proprietary rights is taken, of which property consists." (Emphasis added.)

*Thompson v. Androscoggin Company,* 54 N.H. 545, 551–552 (1874).

Thus it was that New Hampshire early recognized the social policy to be effected through eminent domain proceedings. When awarding compensation in eminent domain proceedings, the property rights of an individual as against the public are the same as his rights against other individuals. Implicit in the nature of such proceedings is the notion that society desires to purchase from a condemnee the identical property rights which a legal system designed to adjust the condemnee's relations with private individuals would recognize, the only difference that should exist between a sale to society and one to a private individual is that the former may acquire property that the latter could not buy. *See* Cormack, supra, page 240.

*United States v. General Motors Corp.,* 323 U.S. 373, 377–378, 65 S.Ct. 357, 359, 89 L.Ed. 311, 318 (1945) recognized that two views as to the meaning of property are possible, but said that the broader view is the proper one

to use when defining the rights of a person whose property is taken pursuant to the power of eminent domain. There the Court said:

"The correctness of the decision of the court below depends upon the scope and meaning of the constitutional provision: 'nor shall private property be taken for public use, without just compensation', which conditions the otherwise unrestrained power of the sovereign to expropriate, without compensation, whatever it needs.

The critical terms are 'property,' 'taken' and 'just compensation.' *It is conceivable that the first was used in its vulgar and untechnical sense of the physical thing* with respect to which the citizen exercises rights recognized by law. *On the other hand, it may have been employed in a more accurate sense to denote the group of rights inhering in the citizen's relation to the physical thing, as the right to possess, use and dispose of it.* In point of fact, the construction given the phrase has been the latter. (footnote omitted). When the sovereign exercises the power of eminent domain it substitutes itself in relation to the physical thing in question in place of him who formerly bore the relation to that thing, which we denominate ownership. In other words, it deals with what lawyers term the individual's 'interest' in the thing in question. That interest may comprise the group of rights for which the shorthand term is 'a fee simple' or it may be the interest known as an 'estate or tenancy for years', as in the present instance. *The constitutional provision is addressed to every sort of interest the citizen may possess.*" (Emphasis added.)

More recently, in *Almota Farmers E. & W. Co. v. United States,* 409 U.S. 470, 93 S.Ct. 791, 35 L.Ed.2d 1 (1973), the United States Supreme Court continued to include within the meaning of the term "property" every sort of interest which a citizen may possess. *Almota*

held that "upon condemnation of a leasehold, a lessee with no right of renewal is entitled to receive as compensation the market value of its improvements without regard to the remaining term of its lease, because of the expectancy that the lease would have been renewed." *Id.* at 473, 93 S.Ct. 794, 35 L.Ed.2d at 7. "*[A]n element of great inherent value in the improvements [may not] be excluded* merely because it does not, by itself, rise to the status of legal property right." (Emphasis in original). Footnote 1, *Id.* at 473, 93 S.Ct. at 794, 35 L.Ed.2d at 7. Almota Farmers Co., leased property from a railroad company on which Almota had constructed certain improvements. Their then current lease had seven and one-half years remaining at the time of the railroad's fee. The government argued that the lessee should be compensated only for "the fair market value of the legal rights possessed [by it] by virtue of the lease as of the date of the taking." (the value of the loss of use and occupancy for the seven and one-half years remaining in the lease). *Id.* at 471, 93 S.Ct. at 793, 35 L.Ed.2d at 6. Lessee argued, and the district court decided, that compensation should be based on what a willing buyer would pay for the leasehold in an open market. In determining the price that would be paid by such a willing buyer, consideration was given to the enhanced value that the leasehold possessed because of the expectation that it would be renewed. The Court of Appeals reversed and adopted the government's position. The Supreme Court in turn reversed the Court of Appeals, reasoning that:

"The value of the buildings, machinery, and equipment *in place* would be substantially greater than their salvage value at the end of the lease term, and a purchaser in an open market would pay for the anticipated use of the buildings and. for the savings he would realize from not having to construct new improvements himself. (Emphasis added.)

. . . . . . . .

By failing to value the improvements in place over their useful life—taking into account the possibility that the lease would be renewed as well as the possibility that it might not—the Court of Appeals in this case failed to recognize what a willing buyer would have paid for the improvements."

*Id.* at 471–472 and 474, 93 S.Ct. at 793–794, 13 L.Ed. 2d at 6 and 7–8.

"[J]ust compensation derives as much content from the basic equitable principles of fairness . . . as it does from technical concepts of property law." The condemnee's position was to be "no better" than it would have been had the sale been to a private buyer. "But its position should surely be no worse." *Id.* at 478, 93 S.Ct. 797, 35 L.Ed.2d at 10.

Pennsylvania statutory law is in accord with the principles announced by the United States Supreme Court in *Almota Farmers, supra.* The "Eminent Domain Code," 1964 Special Sess., June 22, P.L. 84, Art. I, § 101 et seq., 26 P.S. § 1–101 et seq., provides a complete scheme for the determination and adjustment of rights and duties of the condemnor and condemnee in an eminent domain proceeding.

Section 601 sets forth the provisions by which the condemnee's recovery is to be measured:

"The condemnee shall be entitled to just compensation for the taking, injury or destruction of his property, determined as set forth in this article."
(26 P.S. § 1–601).

"Just compensation" is then defined in section 602(a) as:

" . . . the difference between the *fair market value of the condemnee's entire property interest* immediately before the condemnation and as unaffected thereby and the fair market value of his property interest remaining immediately after such condemnation

and as affected thereby, and such other damages as are provided in this code." (Emphasis added.) (26 P.S. § 1–602).

Section 603 then provides that,

"Fair market value shall be the price which would be agreed to by a willing and informed seller and buyer, taking into consideration, but not limited to, the following factors:

(1) The *present use* of the property and its *value for such use.*

(2) The highest and best reasonably available use of the property and its value for such use.

(3) The machinery, equipment and fixtures forming part of the real estate taken.

(4) Other factors as to which evidence may be offered as provided by Article VII." (Emphasis added.) (26 P.S. § 1–603).

The provisions of the Eminent Domain Code do not indicate the legislative adoption of unrealistic, archaic, technical, restricted or unconstitutional standards for determining the "property" for which a condemnee is entitled to just compensation. The Code speaks broadly of "the condemnee's entire property interest," not merely the physical property. The Code specifically permits a consideration of values which accrue to physical property as a result of the use that a property owner makes or may reasonably make of his physical property. Both the "value" of property for its "present use" and its probable future value in the light of "the highest and best reasonably available use" are proper elements to be considered. Value is not determined in a societal vacuum. For example, the value of a piece of physical property located in the middle of the desert would not be identical to its value in the midst of a thriving community.

We have recognized that the value of physical property may be significantly affected by government's "permis-

sion" or "lack of permission" to use the physical property for certain purposes. Thus governmental "permission" in the form of zoning regulations is significant in determining just compensation. Even where the "highest and best use" of the condemned property is prohibited by zoning ordinances existing at the time of the taking, evidence of the enhanced value such property would enjoy in its "highest and best use" is permitted if the possibility of a change in zoning regulations is not too remote or speculative. In *Snyder v. Commonwealth*, 412 Pa. 15, 192 A.2d 650 (1963), the condemnee was permitted to present evidence of the value of the condemned property based on a consideration of the possibility of a change in existing zoning regulations from residential only to commercial. "[I]n estimating the market value of the land *everything which gives it intrinsic value is a proper element for consideration. . . .* It is its general market value for any purpose that will induce persons to purchase, which is the true test." (Emphasis added.) *Id.* at 19, 192 A.2d at 652. Zoning, the court concluded, is a factor which strongly affects market value, and which is to be considered in arriving at that value.

As pointed out by Mr. Justice Eagen in *Singer v. Oil City Redevelopment Authority*, 437 Pa. 55, 261 A.2d 594 (1970):

> "The intent of the General Assembly in enacting the Eminent Domain Code of 1964 was expressed in House Resolution No. 59, Session of 1959 (Reprinted in Snitzer, *Pennsylvania Eminent Domain*, p. 7), and it is in the spirit of that Resolution that we interpret the Code and make necessary modifications in the common law." (Footnote omitted.)

*Id.* at 61–62, 261 A.2d at 598.

House Resolution No. 59, Session of 1959 stated:

> " 'There is widespread dissatisfaction in this Commonwealth with the present laws relating to the con-

demnation of private property for public purposes and with the procedure in effect thereunder for determining the amount of damages to be awarded in connection with such takings . . .. The courts have been handicapped in developing satisfactory procedures to aid in arriving at substantial justice between the parties involved because of . . . statutory variances and because of judicial precedents which originated largely during the agrarian period of the Commonwealth's history . . ..

'A thorough and exhaustive study of all statutes on the subject of eminent domain now in force in this Commonwealth should be made, and in addition, comparable legislation of other states should be examined for the purposes of :

\*     \*     \*     \*     \*     \*     \*     \*

(4) Developing a more workable and modern definition of "just compensation" which shall be applicable to all condemnors alike; ' "

Footnote 4, *Id.* at 62, 261 A.2d at 598.

The comment to Section 603 of the Code also indicates a realistic legislative attitude toward "just compensation." That comment emphasizes that the provisions of the Code "will permit consideration of any special value the property may have for its existing use, including improvements uniquely related to that use and . . . will provide for proper valuation of special use properties, such as churches, which have no normal market . . .." (26 P.S. § 1–603, Comment—Joint State Government Commission 1964 Report.)

Since the adoption of the Eminent Domain Code of 1964, this Court has consistently held that just compensation must be considered in the light of realistic use values and not "statutory variances and . . . judicial precedents which originated during the agrarian period of the Commonwealth's history." House Resolution No.

59, Session of 1959; *Singer v. Oil City Redevelopment Authority*, 437 Pa. 55, 261 A.2d 594 (1970). We have thus extended the application of the "Assembled Industrial Plant Doctrine," *see Gottus v. Allegheny County Redevelopment Authority*, 425 Pa. 584, 229 A.2d 869 (1967), to preserve the economic position of commercial, service, and other economic units. *Singer v. Oil City Redevelopment Authority*, 437 Pa. 55, 261 A.2d 594 (1970). We have rejected the technical and archaic property concepts of "fixture" and "attachment to realty" in favor of realistic use values. Likewise, the "integrated use doctrine," as promulgated by this Court in an effort to insure just compensation to persons who have integrated property interests in contiguous tracts of land, has recognized that there may be an increase in value as a result of the condemned property's use with other properties of similar utility. Porter v. Commonwealth, 454 Pa. 461 at 465–466, 309 A.2d 709 at 711 (1973).

■ The issuance of a liquor license in Pennsylvania constitutes governmental "permission" to use *particular premises* for a particular purpose. The "Liquor Code," Act of April 12, 1951, P.L. 90, Art. I, § 101 et seq., 47 P. S. § 1–101 et seq. Unless we bog down in technical and unrealistic concepts, it cannot be disputed that a liquor license adds significant use value to a particular premises. Once granted, the license may not be arbitrarily revoked. Indeed, a licensee who is "aggrieved by the refusal of the [Board] . . . to renew or transfer any such license may appeal" to the courts for judicial review. (47 P.S. § 4–464).

The use value added to a particular premises by a liquor license is not unlike the use value which a premises enjoys because it may be used for a particular purpose under a zoning enactment. A significant and helpful analogy may also be noted in situations involving the enhanced use value of property which results from a franchise that permits a particular use of the physical prop-

erty. As early as 1909, this Court held that the value of a condemned waterworks property was to be determined by considering the physical property *as a going concern;* to do so the value of intangibles such as a *franchise,* market price of stock, and income based on reasonable tolls were to be considered. *In re Monongahela Water Co.,* 223 Pa. 323, 72 A. 625 (1909). *See also Kimball Laundry Company v. United States,* 388 U.S. 1, 69 S.Ct. 1434, 93 L.Ed. 1765 (1948) (intangible character of going concern value does not preclude compensation for its taking).

■ Although this Court has not had occasion previously to consider the use value of a liquor license in a condemnation proceeding, we have held that a liquor license has value for which a private person must be compensated when that value is destroyed by another private person. *Kosco v. Hachmeister, Inc.,* 396 Pa. 288, 152 A. 2d 673 (1959). Later, in *Feitz Estate,* 402 Pa. 437, 167 A.2d 504 (1961), in an opinion by the present Chief Justice Jones, we reaffirmed the *Kosco* view that a liquor license is "very often valuable." We would not allow the license to be considered as an asset of a decedent's estate for inheritance tax purposes—not because the liquor license was not a valuable asset, but because the license itself did not pass to the estate. Indeed, in addition to noting that a liquor license can be a valuable asset, *Feitz* held that even though a decedent's license had terminated upon death, the decedent's estate was enhanced by the passing to the estate of the right to transfer the license held by the decedent prior to death. *Feitz* said:

"The license itself does not pass to his estate. However, the valuable incident of the right to apply for a new license which the Board is authorized to grant does pass under the Liquor Control Act . . . to the surviving spouse or the personal representative [or to a person designated by him]. Therefore, to the extent of the value of the right to apply for a new license

in the name of the surviving spouse or the personal representative [or in the name of the person designated in the will] and the consequent right of sale and transfer, the estate is enhanced."

*Id.* at 444, 167 A.2d at 507.

*Feitz* noted that "[i]n such cases the license *or* right to do business becomes a valuable property right . . . . *It is property with value and quality."* (Emphasis added.) *Id.* at 444, 167 A.2d at 507. *Feitz* spoke of "common sense and realistic thinking;" and approached the issue before it without the use of ancient, archaic, and technical concepts. *Feitz* refused to "ignore the practicalities of the situation [or] to substitute abstract theories, for the realities of the market place." *Id.* at 445, 167 A.2d at 508.

A liquor license has also been considered "property" in other situations. *See Boss, Co., Inc. v. Bd. of Commissioners of Atlantic City,* 40 N.J. 379, 192 A.2d 584 (1963) (liquor license is property subject to internal revenue tax lien); *Cordano's Appeal,* 91 Conn. 718, 101 A. 85 (1917) (liquor license is property with pecuniary value subject to sale, levy or replevin); *Lane v. Hewgley,* 155 S.W. 348 (Tex.Civ.App.1913) (liquor license is valuable property interest which is subject of trade and entitled to constitutional protection). Compensation has also been allowed in a variety of other license situations. *United States v. Citrus Valley Farms, Inc.,* 350 F.2d 683 (9th Cir. 1965) (condemnee entitled to compensation based upon the enhanced value caused by government license to grow cotton on condemned land); *United States v. Smoot Sand and Gravel Corp.,* 248 F.2d 822 (4th Cir. 1957) (condemnee entitled to compensation for loss of right granted to riparian land owners to remove sand and gravel from tideland waters owned by state); *Jackson v. United States,* 103 F.Supp. 1019, 122 Ct.Cl. 197 (1952) (plaintiff's fishing rights in Chesapeake Bay, granted by state statute, was property taken).

A factual situation almost identical to that presented in the instant appeal was considered in *State v. Saugen,* 283 Minn. 402, 169 N.W.2d 37 (Sup.Ct.1969). The appellant in *Saugen* had operated a liquor lounge which the State of Minnesota took by eminent domain. The appellant in *Saugen,* like the appellant in the instant case, operated the liquor establishment under the authority of a valid and unrevoked liquor license which was transferable to other persons with the consent of the proper authorities. Revocation of the license would have been proper, following a hearing, only upon a showing of violation of the ordinances and laws relative to which the license was issued. *Saugen* held that the liquor license was "property" compensable in an eminent domain proceeding.

■ The fact that a liquor license is sometimes referred to as a "privilege" rather than a "right" is irrelevant to the issue before us. We rejected the nomenclature argument in *Kosco v. Hachmeister, Inc., supra,* 396 Pa. 288, 152 A.2d 673 (1959). *See also Feitz Estate, supra,* 402 Pa. 437, 167 A.2d 504 (1961); and *Chalk Appeal,* 441 Pa. 376, 272 A.2d 457 (1971). Rigid labels, such as "right" or "privilege," cannot determine a person's constitutional and statutory right to "just compensation." In *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), the Court addressed itself to the meaning of the "broad and majestic terms" "liberty" and "property:"

"They are among the '[g]reat [constitutional] concepts . . . purposely left to gather meaning from experience . . . . [T]hey relate to the whole domain of social and economic fact, and the statesmen who founded this Nation knew too well that only a stagnant society remains unchanged.' (Citations omitted.) For that reason, *the Court has fully and finally rejected the wooden distinction between 'rights' and 'privileges'* that once seemed to govern the applicabili-

ty of procedural due process rights." (Footnote omitted.) (Emphasis added.)

*Id.* at 571, 92 S.Ct. at 2706, 33 L.Ed.2d at 557.

"[T]his Court [the United States Supreme Court] now has rejected the concept that constitutional rights turn upon whether a governmental benefit is characterized as a 'right' or as a 'privilege.' "

*Graham v. Richardson,* 403 U.S. 365, 374, 91 S.Ct. 1848, 1853, 29 L.Ed.2d 534, 543 (1971). *See also State v. Saugen, supra,* 169 N.W.2d 37 (Sup.Ct.1969); *Lane v. Hewgley, supra,* 155 S.W. 348 (Tex.Civ.App.1913).

■ We conclude that the trial court properly considered the loss of value in the condemnee's liquor license resulting from the condemnation. That loss resulted from the destruction of a property interest within the meaning of the United States Constitution and Pennsylvania Constitution, and the Eminent Domain Code. To hold otherwise would be to ignore reality.

■ The trial court's award of $5,000 for business dislocation damages pursuant to former section 609 of the Eminent Domain Code is also challenged by the condemnor. Section 609 was repealed on December 29, 1971, subsequent to the commencement of this action but prior to the conclusion of the trial. The condemnee, however, was entitled to the benefit of that section. The Statutory Construction Act provides as follows (1 Pa. S. § 1976(a)):

"(a) The repeal of any civil provisions of a statute shall not affect or impair any act done, or right existing or accrued, or affect any civil action pending to enforce any right under the authority of the statute repealed. Such action may be proceeded with and concluded under the statutes in existence when such action was instituted, notwithstanding the repeal of such statutes, or such action may be proceeded with and

concluded under the provisions of the new statute, if any, enacted."

Since appellant chose to seek relief under the new repealed statute, he is entitled to the relief provided in the repealed section.

After finding that the condemnee's business could not be relocated without substantial loss of patronage, the trial court determined the $5,000 award by multiplying the monthly rental of the premises by twenty-four as provided by Section 609. The product of that computation was actually $6,000 but the trial court reduced the amount to $5,000, the maximum allowed under Section 609. Section 609 provides in part:

> "Compensation for such dislocation shall be the actual monthly rental paid for the business premises, or if there is no lease, the fair rental value of the business premises, multiplied by the number of months remaining in the lease, not including unexercised options, not to exceed twenty-four months or multiplied by twenty-four if there is no lease. The amount of such compensation paid shall not exceed five thousand dollars ($5000) and shall not be less than two hundred fifty dollars ($250)."

> (Former 26 P.S. § 1–609; repealed by Acts 1971, P.L. 635, No. 169, § 6).

■ The condemnor contends that a multiplier of five months should have been used since only five months remained on the condemnee's lease when he was evicted from the premises on June 1, 1969. We do not agree. On June 1, 1969, there was no lease in effect; it had terminated by its own terms at the time of the taking on January 30, 1969. Under such circumstances, the trial court properly used twenty-four months as the multiplier.

■ The condemnor in this appeal has raised other issues concerning certain evidence introduced by the con-

demnee. No objection to the evidence was made at trial by the condemnor. That issue is thus not properly before us. *Dilliplaine v. Lehigh Valley Trust Co.*, 457 Pa. 255, 322 A.2d 114 (1974).

The order of the Commonwealth Court is vacated and the order of the trial court is affirmed.

JONES, C. J., did not participate in the consideration or decision of this case.

EAGEN, J., filed a dissenting opinion.

EAGEN, Justice (dissenting).

I am in complete agreement with the majority that for the purposes of eminent domain, a liquor license is a property interest and the value thereof is an element to be considered in computing the damages resulting from the condemnation here involved. However, like the Commonwealth Court I am convinced that in fixing the value of the license instantly, the trial court erroneously considered the loss of business profits.

I would therefore remand the record to the trial court with instructions for a correct computation of the value of the license.