Paul CONTI, individually, and Conti Corporation, as owner of F/V Providenza, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 99–987C.

United States Court of Federal Claims.

Jan. 11, 2001.

---

Paul Antinori, North Andover, Massachusetts, for the plaintiff.

Marian E. Sullivan, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C. with whom on the brief were, David M. Cohen, and Deborah A. Bynum, and David W. Ogden, Acting Assistant Attorney General, for the defendant. Marian McCall and Deborah Ben–David, National Oceanic and Atmospheric Administration, of counsel.

## OPINION

MARGOLIS, Senior Judge.

This takings claim is before the Court on government's motion to dismiss pursuant to RCFC 12(b)(4) for failure to state a claim. After careful consideration of the parties' written and oral arguments, the Court concludes that plaintiff has not stated a claim for relief. The government's motion to dismiss is therefore GRANTED.

## FACTS

In ruling on this motion to dismiss, the Court assumes all credible facts as alleged by plaintiff to be true.

Plaintiff, Paul Conti, resides in the port city of Gloucester, Massachusetts where he has harvested swordfish since 1985. Plaintiff has always used drift gillnets. His fishing vessel, the F/V PROVIDENZA, was specially designed and built for use in drift gillnet fishing.[1] Plaintiff fishes in the Atlantic Swordfish Fishery[2] under a limited access permit issued to him by the National Marine Fishery Service ("NMFS"). The permit allows swordfish harvesting subject to all NMFS regulations. Plaintiff must apply an-

---

1. There are three methods of harvesting swordfish: drift gillnet, longline, and handgear. Longline is the predominant method. On the entire East Coast there are approximately 15 fishermen who use drift gillnets—plaintiff is currently the only one in Gloucester. Drift gillnets are nets, when set end to end, extend about one mile, float six to ten fathoms beneath the surface of the water, and comprise 20 inch mesh size. Longline fishing is considerably different from gillnet fishing, requiring larger vessels and crews and different gear. Longline fishermen can venture far out into the ocean for long periods of time whereas drift gillnet fishing trips last only about 12 to 15 days. Although gillnet gear is prohibited, the use of longline and handgear methods is still allowed. *See* 50 C.F.R. §§ 635.21(d)(4)(i), (ii), 635.71(a)(17) (2000).

2. Fishery is defined as "one or more stocks of fish which can be treated as a unit for purposes of conservation and management and which are identified on the basis of geographical, scientific, technical, recreational, and economic characteristics; and (B) any fishing for such stocks." 16 U.S.C. § 1802(13) (2000).

nually for the permit which is valid for the stated period unless revoked, suspended, or modified. *See* 50 C.F.R. §§ 635.4(a)(6), (k), (m) (2000). Plaintiff generally takes a few fishing excursions per year. In July 1997, plaintiff prepared for his fishing trip by fueling his vessel and making provisions for himself and his crew. Prior to his departure, the United States Coast Guard informed plaintiff that the use of gillnet gear was prohibited and warned him not to embark on his trip. Plaintiff has not fished since that time.

Fishery conservation and management in the United States is complex and pervasive. Fisheries are subject to many regulatory statutes: the Magnuson–Stevens Act, 16 U.S.C. § 1801 *et seq.*, the Atlantic Tunas Convention Act, 16 U.S.C. § 971 *et seq.* (implementing the terms of the International Commission for the Conservation of Atlantic Tunas), the Marine Mammal Protection Act, 16 U.S.C. § 1361 *et seq.*, and the Endangered Species Act, 16 U.S.C. § 1531 *et seq.* The primary regulatory statute is the Magnuson–Stevens Act, 16 U.S.C. § 1801 *et seq.*, ("Act") which gives the Secretary of Commerce the power to regulate fisheries. The Act aims to prevent overfishing of fish stock while obtaining the maximum yield for each fishery. *See* 16 U.S.C. § 1851(a)(1) (2000). Fishery management is effected primarily through Fishery Management Plans ("FMP"s), which are prepared and managed by fishery management councils,[3] *see* 16 U.S.C. § 1852(a) (2000), and approved by the Secretary. *See* 16 U.S.C. § 1852(h)(1) (2000). These FMPs must contain measures designed to "prevent overfishing and rebuild overfished stock and to protect, restore, and promote the long-term health and stability of the fishery." *See* 16 U.S.C. § 1853(a)(1)(A) (2000). Further, they must describe the "type and quantity of fishing gear used." *See* 16 U.S.C. § 1853(a)(2) (2000). The Act also permits the FMPs to "prohibit, limit, condition, or require the use of specified types and quantities of fishing gear, fishing vessels, or equipment." *See* 16 U.S.C. § 1853(b)(4) (2000).

Additionally, an FMP may include quotas, limited access systems, and permit regulations. *See* 16 U.S.C. § 1853(b) (2000).

In 1985, the South Atlantic Fishery Management Council, in conjunction with the New England, Caribbean, Gulf of Mexico, and Mid–Atlantic Councils, submitted an FMP to the NMFS for the Atlantic Swordfish Fishery. *See* Atlantic Swordfish Fishery, 50 Fed.Reg. 33,952 (1985). The NMFS' Final Rule adopted a permit requirement for commercial swordfish vessels, began a data collection system to gather more information on drift gillnet use and effects, and enacted seasonal closure times. *See* 50 C.F.R. §§ 630.4, 630.5, 630.21 (1985). The Secretary approved the NMFS action and the Atlantic Swordfish Fishery has been subject to increasing government regulation ever since.

Drift gillnet use became an area of international concern because of large amounts of bycatch.[4] As a result, the United Nations banned their use in international waters in 1989. G.A. Res. 225, U.N. GAOR, 44th Sess., 85th plen. mtg., U.N. Doc A/44/225 (1989). In 1991, restrictions on size and quotas were implemented on drift gillnet gear users. *See* Atlantic Swordfish Fishery, 56 Fed.Reg. 65,-007 (1991). As a result of the quotas, the drift gillnet gear quota was often met within two weeks. *See* Atlantic Swordfish Fishery, 58 Fed.Reg. 37,443, 37,444 (1993). In 1995, in order to reduce incidental bycatch, the Atlantic Offshore Cetacean Take Reduction Team was formed. The Team submitted a study and plan to the NMFS to reduce drift gillnet entanglements with marine mammals. Atlantic Offshore Cetaceans Take Reduction Plan, submitted to NMFS by Susan Podziba, Nov. 22, 1996. Further, a provision was added to the Magnuson–Stevens Act, requiring all FMPs and regulations to be consistent with the goal of minimizing bycatch and bycatch mortality. *See* 16 U.S.C. § 1851(a)(9) (2000). In order to stay within international quotas, the Atlantic Swordfish Fishery is of-

---

**3.** Atlantic swordfish, however, are also managed directly by the Secretary of Commerce. *See* 16 U.S.C. §§ 1852(a)(3), 1854(g) (2000).

**4.** Bycatch is defined as "fish which are harvested in a fishery, but which are not sold or kept for personal use, and includes economic discards and regulatory discards." 16 U.S.C. § 1802(2) (2000).

ten closed. *See* Atlantic Swordfish Fishery; Drift Gillnet Emergency Closure, 61 Fed. Reg. 64,486 (1996). In fact, the NMFS closed the entire fishery from December 1996 through July 1998, re-opening for only 14 days in August 1998. *See* Atlantic Swordfish Fishery, Drift Gillnet Emergency Closure, 61 Fed.Reg. 64,486 (1996); Extension of Drift Gillnet Emergency Closure, 62 Fed. Reg. 30,775 (1997); North Atlantic Swordfish Fishery; Closure, 63 Fed.Reg. 41,205 (1998). In both 1996 and 1997, the swordfish quota was again reduced. *See* Atlantic Swordfish Fishery; 1996 Quotas, Minimum Size, Adjustment, 61 Fed.Reg. 27,304 (1996); Atlantic Swordfish Fishery; Annual Quotas, 62 Fed. Reg. 55,357 (1997). In July 1997, the NMFS issued additional restrictions on gillnet use in order to reduce the incidental takes of certain types of whales. *See* Taking of Marine Mammals Incidental to Commercial Fishing Operations; Atlantic Large Whale Take Reduction Plan Regulations, 62 Fed.Reg. 39,157 (1997). Then, in October 1997, the NMFS determined the swordfish stock was overfished and sought ways to rebuild and preserve the stock. *See* Atlantic Highly Migratory Species; Scoping Meetings, 62 Fed.Reg. 54,035 (1997).

In 1996, the NMFS issued an Emergency Order prohibiting the use and possession of gillnets for harvesting swordfish. *See* 50 C.F.R. §§ 635.71(a)(17), (e)(8) (2000) ("it is unlawful for any person . . . [to] fish for Atlantic tunas or swordfish with a gillnet . . ."). The Final Rule was issued and then codified in January 1999. *See* 50 C.F.R. §§ 635.71(a)(17), (e)(8) (2000). The purpose behind the order was to reduce the occurrence of bycatch by drift gillnet fishermen and to improve the conservation and management of the "swordfish resource and other marine resources . . ." *See* 64 Fed.Reg. 4,055 (1999). It was noted that the "take" of mammals in the Atlantic Swordfish Fishery by driftnet gear was considerably higher than the incidental "take" for the other gear types. *See* 63 Fed.Reg. 55,998 (1998). Fur-

ther, the cost of managing the driftnet fishery is extremely high and because swordfish and a few other species have been deemed overfished, it is not economic. *See* 63 Fed. Reg. 55,998 (1998). In reaching this decision, the NMFS considered the ban's economic benefits and costs as well as conservation goals. *See* Atlantic Swordfish Fishery; Management of Driftnet Gear, 64 Fed.Reg. 4,055 (1999). The NMFS also compared those benefits, costs, and conservation goals with the Take Reduction Team's less restrictive plan. *See* Atlantic Swordfish Fishery, Management of Driftnet Gear, 63 Fed.Reg. 55,998 (1998). The NMFS order was issued in order to restock swordfish, protect other marine resources and to reduce bycatch. *See* Atlantic Swordfish Fishery, Management of Driftnet Gear, 64 Fed.Reg. 4,055 (1999). The order bans the possession and use of drift gillnet gear but allows the swordfish harvesting by both the longline and handgear methods.[5] *See* 50 C.F.R. §§ 635.71(a)(17), (e)(8), 635.21(d)(4)(i) (2000). In order to lessen the impact of the ban, those with permits may sell their permit to another for use with non-drift gillnet gear. *See* 50 C.F.R. § 635.21(d)(1) (2000). The permits were not previously transferable. *See* 50 C.F.R. § 635.4(*l*) (2000).

Plaintiff alleges the ban on drift gillnet use deprives him of his property interests. He argues that all economically viable use and enjoyment of his property has been taken by the NMFS order, constituting a Fifth Amendment regulatory taking. The government alleges that plaintiff has no protectable property interest and therefore his takings claim must fail. Plaintiff claims that at 75 years old he has no other skills and cannot enter an alternative commercial venture. He alleges that the government must compensate him for the F/V PROVIDENZA's loss in value and storage costs, the cost of his gillnets, the loss of anticipated revenue, expenses incurred in preparation for the 1997 fishing trip, and the value of his swordfish permit.

---

**5.** Longline is generally, "a heavy fishing line . . . several miles long and that has baited hooks in series." Webster's New Collegiate Dictionary 672 (1979). It can be either "anchored, floating, or attached to a vessel . . . [and] retrieved by hand or mechanical means." *See* 50 C.F.R. § 635.2 (2000). Handgear "means handline [released and retrieved by hand, rather than by mechanical means], harpoon, rod and reel or bandit gear." *See* 50 C.F.R. § 635.2 (2000).

## DISCUSSION

### I. National Marine Fishery Service Final Rule

 Plaintiff alleges in his complaint that NMFS has failed to comply with all the National Standards mandated by Congress in the Magnuson–Stevens Act in enacting the drift gillnet ban. The government, in its motion to dismiss, correctly notes that plaintiff cannot both challenge the NMFS' action and bring a takings claim in this Court. First, the Magnuson–Stevens Act mandates that challenges to regulations must be brought in a District Court. *See* 16 U.S.C. § 1855(f)(1) (2000). Second, a claimant must concede an action is authorized in order to bring a valid takings claim. *See Florida Rock Industries, Inc. v. United States,* 791 F.2d 893, 899 (Fed.Cir.1986); *Del–Rio Drilling Programs v. United States,* 146 F.3d 1358, 1362 (Fed.Cir.1998). An "unlawful" taking cannot support a takings action. *See Tabb Lakes, Ltd. v. United States,* 10 F.3d 796, 802 (Fed.Cir.1993). In plaintiff's response brief, he claims that he did "not challenge the government's authority" to issue the regulation, rather that his allegation was a demonstration of the character of the government's action. Taking that statement as true, the Court finds that plaintiff is not challenging the validity of the regulation and will not consider the issue further.

### II. Standards for a 12(b)(4) Motion to Dismiss

In deciding a Rule 12(b)(4) motion to dismiss for failure to state a claim upon which relief can be granted, the Court must construe the allegations in the complaint favorably to the plaintiff and draw all reasonable inferences in favor of the plaintiff. *See Perez v. United States,* 156 F.3d 1366, 1370 (Fed. Cir.1998). A motion to dismiss cannot be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). Dismissal is appropriate and a hearing unnecessary, however, "where the circumstances alleged in the complaint, even if taken as true ... cannot establish that a taking has occurred." *Atlas Corp. v. United States,* 895 F.2d 745, 757 (Fed.Cir.1990).

### III. Standards for Takings Cases

 The Fifth Amendment provides that private property shall not be taken for public use without just compensation. U.S. Const. amend. V. A taking not only occurs by physical possession or occupation, but also by government regulation. *See Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 415, 43 S.Ct. 158, 67 L.Ed. 322 (1922). Only when government regulation goes "too far" does it effect a compensable taking. *See M & J Coal v. United States,* 47 F.3d 1148, 1153–54 (Fed.Cir.1995); *Pennsylvania Coal,* 260 U.S. at 415, 43 S.Ct. 158. A regulation depriving the claimant of the most profitable use of his property, however, is not a per se taking. *See Mugler v. Kansas,* 123 U.S. 623, 664, 668–69, 8 S.Ct. 273, 31 L.Ed. 205 (1887); *Florida Rock Industries,* 791 F.2d at 901 ("[t]he fifth amendment ... does not find a taking in a mere denial of the ... most profitable use, that would be available in the absence of regulation.")

 The Federal Circuit has adopted a two-step analysis for takings claims. *See M & J Coal,* 47 F.3d at 1153–54. First, the court must determine whether the plaintiff has a property interest within the meaning of the Fifth Amendment. *See id.,* 47 F.3d at 1154; *Store Safe Redlands Assoc. v. United States,* 35 Fed.Cl. 726, 736 (1996). Second, if a property interest is found, then the court performs an "ad-hoc, fact-based inquiry" into "the economic impact of the regulation on the claimant ... the extent to which the regulation has interfered with distinct investment-backed expectations... [and] the character of the government action." *See Penn Cent. Transp. Co. v. New York City,* 438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978).

#### A. Plaintiff's fishing vessel and gillnet gear

Plaintiff first purports to have a property interest in his fishing vessel and gillnet gear. His ownership of both has traditional charac-

teristics of private property. Plaintiff has not, however, alleged a physical taking of either the vessel or the gear. Indeed, although plaintiff claims his vessel, gear, nets, provisions, earnings, and the permit constitute a "bundle of rights," he only alleges that the right and opportunity to earn a living and to *use his property for that purpose* has been taken—not the property itself. Plaintiff has not demonstrated any "set of facts in support of his claim which would entitle him to relief." *See Scheuer*, 416 U.S. at 236, 94 S.Ct. 1683 (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). "[W]here the circumstances alleged in the complaint, even if taken as true ... cannot establish that a taking has occurred" dismissal is appropriate. *Atlas Corp.*, 895 F.2d at 757. Plaintiff is free to sell the vessel and the gear, fish in a different fishery, or put both the nets and the vessel to other uses. Because a taking of the vessel and/or the gear has not been alleged nor shown, the Court need not consider this issue any further.

### B. Plaintiff's Continued Use of Gillnets

Plaintiff next characterizes his property interest as the ability to *use* his property to earn a living, i.e., to fish with gillnets. Plaintiff asserts that all economically viable use and enjoyment of his property has been taken by the ban, constituting a Fifth Amendment regulatory taking. He argues that his "right and opportunity to earn a living by fishing and to use his property for that purpose" have been taken. Pl Response at 5. He claims compensation for lost revenue, expenses incurred in preparation for his 1997 trip, his vessel, his gillnet gear, and the prior value of his fishing permit. The government alleges that plaintiff has no property interest in the continued use of drift gillnets in the swordfish fishery, and therefore the takings claim fails at the first level of analysis. Plaintiff argues, however, that by choosing to focus on a claimed interest in the continued use of the permit in a certain manner, the government has ignored many "sticks" in his bundle of rights—his gear and vessel. Although the government and plaintiff appear to allege different property interests, their characterizations have an identical focus: the

use of the vessel, gear, and permit in a specific manner. Both parties thus allege the same property right-the continued use of plaintiff's vessel, gear, and permit to harvest swordfish in the Atlantic Swordfish Fishery.

The government's overarching argument is that plaintiff's claimed interest is not a protectable property interest, but an interest closer to that of a revocable license or privilege. In making this claim, the government first argues that pervasive industry regulation bars the formation of a property interest. Second, the government claims plaintiff's permit merely grants a privilege. Third, plaintiff's permit lacks any indicia of a private property interest. Finally, the government asserts that the right to use the vessel, gear, and permit with gillnets is not a property interest, but a "collateral" interest, which is unprotected by the Fifth Amendment.

First, the government argues that the comprehensive regulation of the Atlantic Swordfish Fishery bars the creation of a property right. Plaintiff argues that although "the license to fish is regulated ... once issued, investment made on the expectation of being able to pursue this livelihood are valuable Fifth Amendment protectable interests." Pl Response at 10. Although mere "participat[ion] in a heavily regulated industry" does not bar a plaintiff from ever prevailing on a takings claim, *see Maritrans Inc. v. United States*, 40 Fed.Cl. 790, 797 (1998), it does greatly reduce the reasonableness of expectations and reliance on regulatory provisions. *See Allied–General Nuclear Serv. v. United States*, 839 F.2d 1572, 1577 (Fed.Cir. 1988) (Allied–General did not have a property interest in a nuclear facility permit because it "accepted the regulatory scheme"); *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1027–28, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992) ("by reason of the State's traditionally high degree of control over commercial dealings, [a purchaser] ought to be aware of the possibility that new regulation might even render his property economically worthless..."). This court has held that a permitholder's reliance on a permit, reasonable or not, cannot form a property interest protected by the Fifth Amendment. *See*

*Hage v. United States*, 35 Fed.Cl. 147, 171 (1996) ("reliance on the privilege to graze . . . [cannot] create a property interest . . ."); *Bradshaw v. United States*, 47 Fed.Cl. 549, 553 (2000) ("A grazing permit . . . was never intended to become a compensable property right."). Reliance on a permit under a regulatory scheme thus does not mandate the formation of a property right. On the other hand, pervasive regulation does not necessarily bar the formation of a property right. This Court finds that although regulation of the Atlantic Swordfish Fishery does not necessarily preclude plaintiff from obtaining a property interest, plaintiff's reliance on his permit cannot confer a property interest upon him.

Next, the government claims that the fishing permit grants a privilege, not a property interest, to the plaintiff. The government asserts that because the Magnuson–Stevens Act disclaims the creation of property rights by permitholders, Congress' intent is clear: fishery permits do not create property interests. The Act states that a "limited access system authorization [i.e.; permit] shall not create, or be construed to create, any right, title, or interest . . . in any fish . . ." *See* 16 U.S.C. § 1853(d)(3)(D) (2000). Further, the Act states that nothing shall "limit the authority of a Council to submit and the Secretary to approve the termination . . . without compensation to holders of any limited access system permits, of a fish management plan, plan amendment, or regulation . . ." *See* 16 U.S.C. § 1853(d)(2)(A) (2000). Plaintiff argues that this is a "self-serving" statement which "begs the question," i.e., that the government's statement that its own statute or regulation creates no property interest cannot be taken at face value. To the contrary, property interests are often defined by existing rules or understandings. *See Lucas*, 505 U.S. at 1030, 112 S.Ct. 2886; *United States v. Fuller*, 409 U.S. 488, 494, 93 S.Ct. 801, 35 L.Ed.2d 16 (1973) ("The provisions of the Taylor Grazing Act . . . make clear the congressional intent that no compensable property right be created . . ."); *Alves v. United States*, 133 F.3d 1454, 1457 (Fed.Cir.1998) ("What is compensable is the fee interest only, divorced from other governmentally-created rights or privileges . . ."); *Hage v. United States*, 35 Fed.Cl. 147, 169–70 (1996) (no property right found because the Act stated no "right, title, interest or estate" was created by a grazing permit's issuance); *Bradshaw*, 47 Fed.Cl. at 553 ("A grazing permit is a right created by the government and was never intended to become a compensable property right."). This Court finds that the Magnuson–Stevens Act clearly states that plaintiff's permit was not intended to create a property right within the meaning of the Fifth Amendment.

Third, the government argues that plaintiff's alleged property interest is more analogous to a revocable license because the permit lacks the traditional hallmarks of private property. The term property "denotes the group of rights [including] the right to possess, use and dispose" of the claimed interest. *See United States v. General Motors Corp.*, 323 U.S. 373, 377–78, 65 S.Ct. 357, 89 L.Ed. 311 (1945). First, plaintiff's permit lacks an important component of property rights: alienability. As originally granted, plaintiff's permit was not freely alienable, i.e., plaintiff could not transfer, sell, or assign his permit. *See* Atlantic Swordfish Fishery, 50 Fed.Reg. 33,952, 33,957 (1985) (codified at 50 C.F.R. § 635.4(*l*)(1) (2000)).[6] Second, plaintiff lacks "one of the most valuable characteristics of . . . property . . . the right to sole and exclusive possession—the right to exclude. . ." *See Mitchell Arms v. United States*, 7 F.3d 212, 215 (Fed.Cir.1993) (no property interest found because comprehensive regulation of the gun importation industry precluded the right to exclude) (quoting *Hendler v. United States*, 952 F.2d 1364, 1374 (Fed.Cir.1991)). Third, a private property interest is generally not revocable or alterable by another party. The NMFS, however, retains power to alter the terms and conditions of plaintiff's permit by banning any type of gear, vessels, or equipment.

---

**6.** Plaintiff's permit became transferable in 1999, when the Atlantic Swordfish Fishery was changed to a limited access permit system where only past fishery participants were eligible to receive permits. *See* 50 C.F.R. § 635.4(*l*)(2) (1999). Previously, however, the permits were not transferable.

The NMFS may "prohibit, limit, condition, or require the use of specified types and quantities of fishing gear, fishing vessels, or equipment ..." 16 U.S.C. § 1853(b)(4) (2000), as well as revoke or deny a permit for violations of permit conditions, regulations, or statutes. *See* 15 C.F.R. §§ 904.301(a)(1), 904.320(a) (2000).[7] Plaintiff's permit is thus subject to the NMFS' power to alter its terms. The Supreme Court has held that the power to "alter, amend, or repeal" a statutory provision means there is no property interest in the continuation of the provision's current form. *See Bowen v. Public Agencies Opposed to Social Security Entrapment,* 477 U.S. 41, 52, 106 S.Ct. 2390, 91 L.Ed.2d 35 (1986) (Congress's reservation of power allowing it to change a provision of the Social Security Act precluded a taking when Congress later repealed the provision).

Finally, the government argues that rather than a property interest, plaintiff has a collateral interest and that "the Fifth Amendment concerns itself solely with the 'property,' ... and not with other collateral interests which may be incidental to his ownership." *See General Motors Corp.,* 323 U.S. at 378, 65 S.Ct. 357. A collateral interest has been defined as a right *not* inherent in the ownership of the physical property. *See Mitchell Arms,* 7 F.3d at 217. In *Mitchell,* the court found no property interest in plaintiff's right to import guns because that right was not inherent in the ownership of the guns and instead flowed from a permit. *See id.* at 217. Because the gun importer could have done anything with the guns *except* import them into the United States, it was only the "ability to realize an expectation in the ultimate market disposition of the rifles" that was affected. *See id.* at 217. The court found that this "ability" was clearly a collateral interest. *See id.* at 217. Similarly, plaintiff's interest here is collateral because only his ability to use the permit *in a particular manner* has been curtailed. The ability to use gillnets to harvest swordfish is not a right inherent in holding a permit nor in the ownership of the gear or the vessel. Further, plaintiff may still use his permit to fish using a different type of gear or to harvest a different type of fish. He may now also sell his permit. This Court, therefore, finds that plaintiff has no property interest in the continued use of his gear, vessel, or permit in a particular manner.

### C. Property Rights Derived from State Law

Plaintiff attempts to analogize his claim to cases in which the claimant was found to possess property rights in the right to harvest fish. These cases, however, are inapposite. In each of these state cases, the plaintiff is seeking damages for a public nuisance committed by a private defendant. *See Hampton v. North Carolina Pulp Co.,* 223 N.C. 535, 27 S.E.2d 538 (1943); *Columbia River Fishermen's Protective Union v. St. Helens,* 160 Or. 654, 87 P.2d 195 (1939); *Strandholm v. Barbey,* 145 Or. 427, 26 P.2d 46 (1933); *Carson v. Hercules Powder Co.,* 240 Ark. 887, 402 S.W.2d 640 (1966); *Masonite Corp. v. Steede,* 198 Miss. 530, 21 So.2d 463 (1945). As such, these cases are not helpful to plaintiff. This case does not involve a nuisance claim nor was plaintiff's permit obtained from a state agency. Plaintiff is operating under a federal permit. The alleged interference with his fishing comes from the federal government itself under its authority to regulate fisheries. These cases thus do not bolster plaintiff's claim.

Plaintiff also cites cases in which this court found that fishermen had protected property interests in the right to fish. *See Jackson v. United States,* 122 Ct.Cl. 197, 206, 103 F.Supp. 1019 (1952); *Todd v. United States,* 155 Ct.Cl. 87, 91, 292 F.2d 841 (1961). These cases are also inapposite. In *Todd,* the claimant's license was renewable by right, he was licensed to fish in a specific area, and a statute bestowed a property right upon him. *See* 155 Ct.Cl. at 90–91, 292 F.2d 841. In *Jackson,* the claimant's license had indicia of private property because it was renewable by right and could be devised or sold. *See* 122 Ct.Cl. at 206, 103 F.Supp. 1019. Further, the licenses in both *Jackson* and *Todd* were

---

7. Although plaintiff's permit is not revocable at will, it is also not renewable or granted as a matter of right. Compliance with all applicable permit conditions, regulations, and statutes must be maintained.

state permits with which the Federal Government interfered for reasons unrelated to regulation of the fishing waters. *See Jackson*, 122 Ct.Cl. at 206, 103 F.Supp. 1019; *Todd*, 155 Ct.Cl. at 91, 292 F.2d 841. The licenses were thus considered to be property as between the fishermen and a third party. Here, plaintiff's permit has no indicia of private property rights, no statute grants him a property interest, and plaintiff operates under a federal permit with which the federal government interfered for reasons related to the regulatory scheme the permit was issued under—the preservation of marine resources.

## IV. Conclusion

This Court holds that because plaintiff is subject to a pervasive regulatory scheme, the permit is closely analogous to a revocable license or privilege, and the Magnuson–Stevens Act disclaims any grant of a property interest, plaintiff's claim must fail. Plaintiff has no property right in the continued used of his property to fish with gillnet gear and therefore has no takings claim against the government. Consequently, government's motion to dismiss, filed March 31, 2000, is GRANTED. The Clerk will enter judgment for the defendant. Costs for defendant.